# EXHIBIT 1

Page 1

```
1              UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF ILLINOIS
3                   EASTERN DIVISION
4  --------------------------------------------
5  Edna Franchini et al.,
6
7         Plaintiffs,
8
9     vs.              Case Number :1:2021cv05075
10
11 Accu-Time Systems, Inc.,
12
13        Defendant.
14 --------------------------------------------
15       Deposition of Lisa Gladysz 30(b)(6)
16                    Friday
17               January 28th, 2022
18
19                    -at-
20
21          Zoom Remote Deposition
22
23
24
25
```

Page 2

```
1              APPEARANCES
2
3      For the Plaintiffs:
4         Mara A. Baltabols
5         David J. Fish
6         Fish Potter Bolanos, P.C.
7         200 East 5th Avenue
8         Suite 123
9         Naperville, Illinois 60563
10
11      For the Defendant:
12         Sonya Rosenberg
13         Neal, Gerber & Eisenberg, LLP
14         2 North LaSalle Street
15         Suite 1700
16         Chicago, Illinois 60602
17
18      For the Defendant:
19         Andrew M. Zeitlin
20         Shipman & Goodwin LLP
21         300 Atlantic Street
22         3rd Floor
23         Stamford, Connecticut 06901
24
25
```

Page 3

```
1         Also present:
2         Laura Michenfelder
3
4      RECORDER: Okay.  Zoom is recording.  Good
5  morning.  We are now on the record.  Today is Friday,
6  January 28th, 2022.  The time is now 9:01 a.m.  We are
7  meeting remotely today for the deposition of Lisa
8  Gladysz in the matter of Edna Franchini et al. v.
9  Accu-Time Systems, Inc., case number 1:2021cv05075.
10 The venue is Northern District of Illinois, Eastern
11 Division.  Ms. Gladysz, my name is Kristyn Simpson.
12 I'm a notary public, and I'm recording this deposition
13 on behalf of Exhibit 5, LLC.  This deposition is being
14 recorded remotely via Zoom in accordance with Illinois
15 Public Act 101-0640.  Ms. Gladysz, would you please
16 confirm your identity by placing a valid picture ID in
17 front of the camera briefly?
18      MS. GLADYSZ:  Sure.  I can't see it from
19 here.
20      MR. ZEITLIN:  Yeah.
21      MS. GLADYSZ:  I'm not sure I'm in focus.
22      MR. ZEITLIN:  Yeah.
23      MS. GLADYSZ:  Should I move it?
24      MR. ZEITLIN:  Let's see.
25      MS. GLADYSZ:  I'll move it.  There we go.
```

Page 4

```
1      MR. ZEITLIN:  Are you able to see that or not
2  so well?
3      RECORDER:  No, it's kind of fuzzy.
4      MS. GLADYSZ:  What do think of this here?
5      RECORDER:  There we go, yep.  Confirmed.
6  Thank you very much.  At this time, would all attorneys
7  in the virtual room please stipulate that it's okay to
8  administer the oath -- oath to Ms. Gladysz even though
9  she is currently not located within the state of
10 Illinois?
11      MR. FISH:  Agreed.
12      MR. ZEITLIN:  That's fine.  Yep, that's fine.
13      RECORDER:  Great.  Thank you.  At this time,
14 would you please raise your right hand for the oath?
15         (Witness sworn)
16      RECORDER:  Thank you.  Would the attorneys
17 please state their appearances for the record?
18      MR. FISH:  David Fish for Plaintiff.      0:01:49
19      MR. ZEITLIN:  Andrew --
20      MS. BALTABOS:  Mara Baltabos for Plaintiff.
21      MR. ZEITLIN:  I'm sorry.  I didn't get the
22 name?
23      MS. BALTABOS:  Mara Baltabos.
24      MR. ZEITLIN:  Oh, oh, okay.  Sorry, Mara.
25      MS. BALTABOS:  Hi.
```

Page 2 (Pages 5-8)

Page 5

1     MR. ZEITLIN: Yeah, how -- how are you? Andy
2 Zeitlin for the Defendant.
3     MS. ROSENBERG: Sonya Rosenberg for the
4 Defendant.
5     RECORDER: Great. And would anyone else in
6 the virtual room please state their appearance for the
7 record.
8     MS. MICHENFELDER: Laura Michenfelder for the
9 Plaintiff.                          0:02:16
10     RECORDER: Wonderful. That completes the
11 required information and we can proceed.
12          EXAMINATION
13 BY MR. FISH:
14     Q. Good morning, Ms. Gladysz. Can you please
15 state your name?
16     A. Sure. It's Lisa Gladysz.
17     Q. And what is your job? What do you do for a
18 living?
19     A. I am the president and chief executive
20 officer of Accu-Time Systems.
21     Q. All right. You've been designated on behalf
22 of Accu-Time Systems to testify on its behalf pursuant
23 to the notice of deposition in this case, is that
24 correct?
25     A. That's correct.

Page 6

1     Q. Okay. And you've reviewed the notice of
2 deposition? You -- you froze for a minute.
3     A. I have.
4     MR. FISH: Okay. I'm going to mark it as
5 Exhibit 0. I emailed that to you just this morning,
6 Counsel, the -- the notice that we previously sent.
7     MR. ZEITLIN: Yeah.
8     Q. You're prepared to testify as to the nine
9 topics listed on Exhibit 0, the notice of deposition?
10     A. I am.                          0:03:26
11     Q. Okay. Can you tell me briefly your
12 background in terms of positions you have held at
13 Accu-Time?
14     A. Sure. I was hired in October of 2010 as the
15 controller. I became the chief financial officer, and
16 then last -- sorry, two years ago, December -- April
17 1st, 2020, I became the president and CEO.
18     Q. And those aren't what I typically consider as
19 technical titles in terms of, you know, technology, but
20 you're still prepared to testify today within the scope
21 of the deposition notice about how Accu-Time's system
22 works, is that correct?
23     A. Yes, yes, I am.
24     Q. Okay. All right.
25     MR. ZEITLIN: And -- and -- and of -- and of

Page 7

1 course subject to the -- the court order that was
2 entered that limits the deposition to personal
3 jurisdiction.
4     MR. FISH: Correct.
5     Q. Ms. Gladysz, do you know how many users have
6 utilized Accu-Time's finger scanning devices in the
7 state of Illinois?
8     MR. ZEITLIN: Objection, but you may answer
9 the question if you can.                 0:04:48
10     A. So how -- how are you defining users? What
11 do you mean by "users"?
12     Q. People who work at jobs where they have to
13 scan a fingerprint to clock in or clock out.
14     A. So in the state of Illinois --
15     Q. Correct.                          0:05:04
16     A. -- approximately -- as of the end of 2021,
17 approximately 14,000.
18     Q. And for what time period is that?
19     A. That's as of -- that's a snapshot in time as
20 of the end of 2021.
21     Q. Oh, so there's -- at -- currently -- well, as
22 of the end of 2021, there are 14,000 employees in
23 Illinois who are utilizing Accu-Time's finger scan
24 device in the state, correct?
25     MR. ZEITLIN: Objection as to form. You may

Page 8

1 answer.
2     A. Yes, there's a -- there's a total of
3 approximately 124,000 employees in the state of
4 Illinois, and this number fluctuates as customers join
5 our -- contract with us or leave our service, so the
6 number is -- is not static, but out of that 124,000,
7 roughly -- a little over ten percent use the biometric
8 finger scan.
9     Q. Have you looked back historically since, I'll
10 say, 2017 to see how many users in Illinois have
11 utilized Accu-Time's biometric finger scanner in the
12 state of Illinois?
13     A. How --
14     MR. ZEITLIN: I'm going to -- I'm -- I'm
15 going to object as to form as well as the relevant time
16 period, but you may answer if you're able to.
17     A. So have we looked back? No, not to -- I
18 couldn't give you a number but the -- the -- the system
19 -- at -- at most, we've had 18 customers use the system
20 for biometrics. At the end of 2021, we have 16.
21     Q. You're talking about 18 customers in the
22 state of Illinois, correct?
23     A. Eighteen customers using biometrics. At --
24 at --
25     Q. Within the state of Illinois?

Page 9

1  A. Within the state of Illinois.                0:07:10
2  Q. Okay. For purposes of your deposition, have
3  you made any effort to look at the total number of
4  users in the state of Illinois over any period of time
5  other than the snapshot at the end of 2021?
6  A. I would say yes. We've looked at it. This
7  is a business model that has grown over the years. It
8  started with really one customer and has grown to -- we
9  have a total of almost 200 customers globally using the
10 system so we -- we have looked at the growth of the
11 business model.
12 Q. Specifically within the state of Illinois, in
13 the past five years has the number of users fluctuated
14 substantially or has it kind of all been around that
15 14,000 number?
16     MR. ZEITLIN: Objection as to form. You may
17 answer.                                        0:08:19
18 A. So I don't know the number of users -- the --
19 as you defined them, the number of employees using it,
20 but I do know within the last, I would say,
21 approximately two years the number of customers that we
22 had was 12. So we had 12. I know at the end of 2021
23 we had 16, but I couldn't infer from that how many
24 employees were using the system.
25 Q. And -- and typically, in the state of

Page 10

1  Illinois, your biometric time clocks are used by
2  employees who are paid on an hourly basis, correct?
3  A. That would be correct.
4  Q. And so how do you account for turnover in
5  terms of the number of employees who have come and go
6  -- gone out of the system?
7      MR. ZEITLIN: Objection as to form. You may
8  answer.
9  Q. Is there a rule of thumb in terms of turnover
10 that -- that you see?
11     MR. ZEITLIN: Same objection. You may
12 answer.                                        0:09:20
13 A. No, we -- we -- we don't -- we are not the
14 employer and we are not the system of record. So our
15 customers use Workday and Workday is the system of
16 record that keeps track of their employees and who
17 comes, who goes, the hiring and terminations.
18 Q. Do you have access to the system of record?
19 A. No. We receive data from it but we don't
20 have access to it.
21 Q. If you needed to determine the total number
22 of users in Illinois who have utilized the Accu-Time
23 scanner -- biometric scanner within the state of
24 Illinois over that five-year period, how would you
25 figure that out?

Page 11

1  A. We would not be able to.                   0:10:19
2  Q. Why not?
3  A. Once an employee is terminated, their data is
4  deleted from our system within a set time period.
5  Q. Okay. Do you have a record of the number of
6  deletions that have been made from your system?
7  A. I -- I don't think so, but I don't know for
8  sure.
9  Q. Who would know that at Accu-Time?
10     MR. ZEITLIN: Objection as to form and -- and
11 -- and goes beyond the scope of this deposition. You
12 may answer, if you're able to.
13 A. I -- I don't know who would know that. I
14 don't -- I don't know if it's possible for us to get
15 that data.
16 Q. How are you able to determine that, as of
17 December 2021, there were 124,000 people in Illinois
18 that were using Accu-Time's clocks?
19 A. So within our system, we can identify -- not
20 100 percent certainty but where we believe the time
21 clocks are at -- the physical devices are actually
22 located, we know which customers use those devices, and
23 then we can look at their particular database and
24 filter -- we know who's using those devices, if that
25 makes sense.

Page 12

1  Q. How do you know that for specifically people
2  within the state of Illinois? Like, are you looking at
3  an IP address? What -- what -- from a -- how do you
4  have that information about who is in Illinois?
5  A. So when our customers -- when we deploy the
6  solution -- when our customers deploy the devices, they
7  tell us where they're located. Oftentimes, we ship to
8  the location if they request us to. And so based on
9  the location of the device and who's registered to use
10 that device, we can come within an -- a -- a pretty
11 close guess of how many people are actually using it --
12 which employees.
13 Q. So for the 16 -- approximately 16 customers
14 in Illinois who are -- have utilized biometric time
15 clocks, are those customers that were sold directly by
16 ATS or did they also come through resellers?
17 A. No, those are specific -- those were directly
18 sold. They're contracted with ATS.
19 Q. ATS also uses a network of resellers to sell
20 its biometric time clocks within the state of Illinois,
21 correct?
22 A. That is correct.                            0:13:33
23 Q. Okay. And does ATS offer warranty support
24 for customers who are sold through a reseller?
25 A. No, no.

Page 13

1    Q.  Does ATS offer cloud-based backup for
2  customers who are sold through a reseller in the state
3  of Illinois?
4    A.  No, we do not.
5    Q.  Which ATS resellers are located within the
6  state of Illinois?
7        MR. ZEITLIN:  I'm going to -- I'm going to
8  object as beyond the scope of the deposition notice
9  unless you can tell me which of the nine items it falls
10  within.
11        MR. FISH:  Well, it's relating to activities
12  in the state of Illinois.  It's relating to, you know,
13  the functions of what's going on in the state of
14  Illinois, its practices regarding relationships in the
15  state of Illinois, sales in the state of Illinois so I
16  think it's --
17        MR. ZEITLIN:  I -- I -- I'm going to object.
18  The witness can answer, if she's able to.  Maybe you
19  can repeat the question.
20    A.  Yeah, please.                    0:15:05
21    Q.  Are you aware of any ATS resellers that are
22  located in the state of Illinois?
23    A.  That are located -- I'm not aware of any that
24  are located in Illinois.
25    Q.  Okay.  But you're aware that ATS resellers

Page 14

1  sell ATS products in Illinois, correct?
2    A.  Well, I'm not a -- entirely sure.  They're --
3  generally, our customers are national, sometimes even
4  global, resellers.  I -- I couldn't tell you for
5  certain that they've sold in Illinois but I could
6  presume that they have.
7    Q.  And why would you presume that they have?
8    A.  Because of their size and how large they are
9  and how big their customer base is.
10    Q.  So I'm a little unclear how that would work.
11  If a reseller sells an ATS product to a customer
12  located in the state of Illinois, who would then
13  service that customer?
14    A.  They do, the reseller.
15    Q.  And does the reseller then rely on ATS to
16  support it for those Illinois-based customers?
17        MR. ZEITLIN:  Objection as to form.  You may
18  answer, if you're able to.
19    A.  So we provide tier-three support so if their
20  team cannot service the device -- and this is only for
21  hardware -- if their team cannot service the device,
22  the reseller can send the device back to us and our
23  service techs will take a look at it and repair it.
24    Q.  So for the sales that come through the
25  network of resellers, ATS doesn't have any ongoing

Page 15

1  subscription revenue from -- from those customers, is
2  that correct?
3    A.  That is correct.  They're discrete hardware
4  sales only.
5    Q.  So basically, ATS sells the hardware to the
6  reseller and then the reseller sells it to the
7  customer?
8    A.  That's correct.                    0:17:23
9    Q.  Whereas for the 16 direct customers, it would
10  be ATS selling hardware directly to the customer in
11  Illinois, correct?
12    A.  That is correct.
13    Q.  Does the 16 customers in Illinois include
14  customers who also do not use biometric devices, or
15  were you just identifying the ones who use biometric
16  devices?
17        MR. ZEITLIN:  Objection as to form.  You may
18  answer, if you're able.
19    A.  So the 16 are just the customers that use the
20  biometrics.  In Illinois, we have a total of 33.
21    Q.  So there's 33 customers that ATS has in
22  Illinois that use ATS's equipment, correct?
23    A.  Correct.                    0:18:21
24    Q.  And that doesn't include businesses that have
25  purchased ATS equipment through resellers, correct?

Page 16

1    A.  That is correct.
2    Q.  Okay.  How many resellers does ATS utilize?
3        MR. ZEITLIN:  Objection as to form.  You may
4  answer.
5    A.  I actually don't know that number.
6    Q.  Is it -- do you know -- can you give me an
7  estimate?  Are we talking about dozens?
8        MR. ZEITLIN:  Again -- again, I'm going to
9  object.  It -- it goes beyond the scope of the -- of
10  the -- of the court's order.  You know, you're asking
11  about ATS's relationships with resellers and the
12  witness testified the resellers aren't in -- aren't
13  located in Illinois.
14        MR. FISH:  But they sell in Illinois.
15        MR. ZEITLIN:  So I'm not sure how -- what's
16  that?
17        MR. FISH:  But they sell in Illinois.
18        MR. ZEITLIN:  Right.  The resellers do but
19  ATS doesn't sell in -- to -- to them in Illinois.
20  That's the resellers' activities in Illinois.
21    Q.  How do you know that your resellers are not
22  located in Illinois?
23    A.  So we have -- while -- while I can't give you
24  a number, we have really a wide range of sizes of
25  customers and so I couldn't tell you with absolute

Page 17

1 certainty that no one is located in Illinois but of the
2 major -- what we consider our major customers, we know
3 that they're not headquartered in Illinois.
4    Q. You referred to a customer. Did you mean to
5 say a reseller?
6        MR. ZEITLIN: Objection as to form. You may
7 answer.                                    0:19:56
8    A. Yes, I meant to say reseller.
9    Q. Do you know if any of ATS's resellers have
10 offices in Illinois?
11   A. I do not know.
12   Q. Do you know how many biometric collection
13 devices there are located in the state of Illinois that
14 are ATS's?
15       MR. ZEITLIN: Objection as to form. You may
16 answer.
17   A. I'm sorry. Could you repeat the question?
18   Q. How many ATS biometric collection devices are
19 there in the state of Illinois approximately?
20       MR. ZEITLIN: And -- and just -- and just to
21 be clear, are you including the reseller devices?
22   Q. Well, let's -- it's a good point. Why don't
23 we talk about both? Do you know how many ATS biometric
24 collection devices there are in the state of Illinois
25 that are there through ATS customers approximately?

Page 18

1    A. So not the resellers? Our -- our customers
2 using the TimeCom solution?
3    Q. Yes.                                0:21:16
4    A. Biometric devices, again as of the end of
5 last year, approximately 154, which is about
6 one-and-a-half percent of the total devices that are
7 used for our TimeCom solution globally, which is over
8 10,000.
9    Q. When you say 10,000, are you -- are you
10 including those that were sold through resellers?
11   A. No.
12   Q. So on average, if you wanted to figure out
13 the number of biometric devices that each of the 16
14 customers in Illinois has, you -- I assume you'd divide
15 16 by 154, so they have approximately ten each on
16 average?
17       MR. ZEITLIN: Objection as to form, but you
18 may answer.                               0:22:15
19   A. I -- I actually don't know if it's -- if it's
20 that simple. I -- I don't -- I don't know.
21   Q. And is there a rule of thumb that you tell
22 customers in terms of how many employees should be
23 assigned to each -- like, how many biometric devices
24 they should purchase based on their size?
25   A. We do not advise them of that.

Page 19

1    Q. Okay. Why did TimeCom enact a biometric
2 information retention and destruction policy
3 specifically for its Illinois customers?
4        MR. ZEITLIN: I'm going to -- I'm going to
5 object as beyond the scope of the court's order. Why
6 they enacted a policy has nothing to do with personal
7 jurisdiction and it's -- and -- and it -- and it calls
8 for, you know, potentially attorney-client privileged
9 information relating to legal advice.
10       MR. FISH: Well, are you instructing her not
11 to answer?
12       MR. ZEITLIN: Well, it -- unless you can
13 explain how that is within the -- the -- the permitted
14 discovery as permitted by the court's order, yes, I'm
15 going to instruct her not to answer. That -- I mean I
16 -- I don't see how that question relates to personal
17 jurisdiction. Unless the --
18       MR. FISH: I'll ask a little bit different
19 question.
20       MR. ZEITLIN: Okay.                  0:23:54
21    Q. Accu-Time made a decision to enact a
22 biometric policy only for customers that are in the
23 state of Illinois, correct?
24       MR. ZEITLIN: Can you -- I'm sorry. Can you
25 just repeat that question?

Page 20

1    Q. ATS enacted a biometric policy only for
2 customers located in the state of Illinois, correct?
3        MR. ZEITLIN: Same objection. Whatever
4 policy Accu-Time enacted is not -- has nothing to do
5 with personal jurisdiction.
6        MR. FISH: To the extent it's only for
7 Illinois, it is.
8        MR. ZEITLIN: Same objection.
9        MR. FISH: Are you instructing her not to
10 answer?
11       MR. ZEITLIN: Well, I'm -- and I'm also going
12 to object on the grounds that it -- that it goes to
13 attorney-client privileged information.
14       MR. FISH: How is me asking her whether
15 they've only enacted an Illinois policy -- whether
16 that's privileged.
17       MR. ZEITLIN: Wouldn't it --
18       MR. FISH: And if you want to instruct her
19 not to answer, tell her that and we can take it up with
20 the court.
21       MR. ZEITLIN: Well, I want to -- I want to --
22       MR. FISH: But I want to get through this
23 deposition and -- and I think your questions -- your
24 objections are highly inappropriate, so.
25       MR. ZEITLIN: Why don't you repeat -- why

Exhibit 5, LLC

Page 21

1 don't you repeat the question so we're all clear and we
2 have a clear record of what the question is?
3 Q. Accu-Time enacted a biometric policy
4 specifically for employees who work in the state of
5 Illinois and use ATS equipment, correct?
6 MR. ZEITLIN: You may answer that question.
7 Yeah, you may answer that question.
8 A. Yes, we did. 0:25:36
9 Q. And it hasn't enacted a biometric policy for
10 any other state other than Illinois, correct?
11 MR. ZEITLIN: I -- I'm going to instruct the
12 witness not to answer that question. That has nothing
13 to do with personal jurisdiction in the state of
14 Illinois.
15 Q. Do you have Exhibit 1 in front of you?
16 MR. ZEITLIN: What is that -- what is that
17 document?
18 MR. FISH: It's the biometric data
19 information retention policy. I can put it up on the
20 screen if you --
21 MR. ZEITLIN: Yeah, why don't you put it -- I
22 -- I -- I don't -- I didn't -- I -- I have a printout
23 of a bunch of documents, but I don't know which is one
24 and which is two, etcetera, so if you could put it up
25 on the screen that would be helpful.

Page 22

1 MR. FISH: Okay. Can you see Exhibit 1, the
2 TimeCom "Biometric Data Information Retention and
3 Destruction Policy for Applicable Illinois Customers"?
4 MR. ZEITLIN: Does that have a Bates number
5 on it by any chance? No, it doesn't, right?
6 MR. FISH: No.
7 MR. FISH: Okay. Can you see that?
8 WITNESS: Mm-hmm. 0:26:48
9 Q. And Exhibit 1 is ATS's biometric policy for
10 Illinois customers, correct?
11 MR. ZEITLIN: We -- we no longer can see it.
12 MR. FISH: Oh, I'm sorry.
13 MR. ZEITLIN: What -- okay. You want to --
14 can you repeat the question?
15 Q. Exhibit 1 is ATS's biometric policy for
16 Illinois customers, correct?
17 A. That is what's on our website, correct.
18 Q. Do you recall when this was put in place for
19 Illinois customers?
20 MR. ZEITLIN: I'm going to object and
21 instruct the witness not to answer. How is that
22 relevant to -- I mean again, unless you can explain how
23 that's relevant to personal jurisdiction.
24 MR. FISH: It -- it's a policy applicable to
25 Illinois-based customers, its contracts with

Page 23

1 Illinois-based companies, its contacts and how they're
2 reaching out to Illinois people --
3 MR. ZEITLIN: But -- but you're asking --
4 MR. FISH: -- and how they're contracting --
5 MR. ZEITLIN: I'm sorry.
6 MR. FISH: -- specifically for the state of
7 Illinois. So one of the factors the courts look at is
8 that, and so for you to suggest that entering into or
9 providing a policy specifically for Illinois is not
10 relevant to Illinois personal jurisdiction I think is
11 highly inappropriate. And we can take it up with the
12 court if necessary, but I hope you'll let the witness
13 answer.
14 MR. ZEITLIN: Your -- your question was when
15 Accu-Time enacted the policy, correct?
16 MR. FISH: Right. We need to know during
17 what period of time it was put in place.
18 MR. ZEITLIN: Yeah, that -- that -- that --
19 I'm going to instruct the witness not to answer that.
20 The -- the date of when they enacted the policy is not
21 relevant to personal jurisdiction.
22 Q. The policy was -- the biometric policy for
23 Illinois customers was put into place in the past five
24 years, is that correct?
25 MR. ZEITLIN: And -- and again, I'm going to

Page 24

1 -- I'm going to instruct the witness not to answer that
2 question.
3 Q. The biometric policy for Illinois customers
4 has been provided to each of the Illinois-based
5 customers that utilize one of ATS's biometric devices
6 in the state of Illinois, correct?
7 MR. ZEITLIN: You may -- you may answer that
8 question.
9 A. Yes, I believe so. 0:29:06
10 Q. And when did ATS provide its Illinois
11 customers with its policy regarding the collection of
12 biometric information?
13 MR. ZEITLIN: Objection. This does not go to
14 personal jurisdiction.
15 MR. FISH: Are you instructing her not to
16 answer?
17 MR. ZEITLIN: I am, because it doesn't go to
18 personal jurisdiction.
19 Q. In the scope, it references -- of Exhibit 1,
20 it references that this is for -- the policy applies to
21 the biometric data of the employees of Accu-Time's
22 customers who utilize the TimeCom or AccuCloud
23 installations in Illinois. Does that include Ecolab in
24 Illinois?
25 A. Yes, it does. 0:30:17

Page 25

1    Q.  And does that include the other 16 customers
2  that you mentioned that use Accu-Time's biometric
3  collection devices in the state of Illinois?
4    A.  The other 15. Ecolab is one of the 16, but
5  yes.
6    Q.  Okay. Did ATS email a copy of its Illinois
7  biometric policy to its customers? How -- how did it
8  get it to them?
9      MR. ZEITLIN:  Again, object -- how does --
10  I'm trying to understand, David, how this relates to
11  personal jurisdiction. How -- how -- in other words,
12  how ATS provided its policy to its customers, how does
13  that relate to personal jurisdiction?
14      MR. FISH:  We want to know about their
15  activities in the state of Illinois.
16      MR. ZEITLIN:  Yeah, I -- I'm going to object.    0:31:16
17      MR. FISH:  They came here and provided it,
18  whether they mailed it, whether they emailed it.
19      MR. ZEITLIN:  Yeah, that -- that does not
20  relate to personal jurisdiction. I'm -- I am going to
21  instruct the witness not to answer.
22      MR. FISH:  Counsel, I'm going to friendly --
23  give you a friendly reminder of our judge's standing
24  order about depositions and speaking objections. I
25  think that your objections have been highly

Page 26

1  inappropriate, and you know, again, we can take it up
2  with the court, but for you to suggest that we can't
3  ask, for instance, whether they handed a policy to
4  somebody in Illinois or whether it was emailed, you
5  know, all very inappropriate. So are you continuing to
6  instruct her not to answer?
7      MR. ZEITLIN:  I am instructing her not to
8  answer the question as to how they provided the policy
9  to their customers in Illinois, yes. It doesn't go to
10  personal jurisdiction.
11      MR. FISH:  Okay.                       0:32:08
12      MR. ZEITLIN:  As I --
13      MR. FISH:  Andy, your -- that -- that's your
14  instruction. We'll take it up with the court.
15      MR. ZEITLIN:  Okay.
16    Q.  I'm going to show you what was previously
17  marked as Exhibit 4, which was tendered to your
18  counsel, which for the record is stamped Ecolab 000225.
19  Can you tell me what this is?
20    A.  It -- it's a -- it appears to be a copy of
21  the screen that's presented to an employee when they
22  present their finger on the device of -- that -- that
23  is part of the -- excuse me, the TimeCom solution.
24    Q.  So when employees in Illinois utilize a -- an
25  ATS biometric time clock in Illinois and they're being

Page 27

1  enrolled in it, they would enter into this agreement
2  with Accu-Time to allow the collection of their
3  biometric information?
4      MR. ZEITLIN:  Objection as to form. You may
5  answer.                                   0:33:22
6    A.  Yes.
7    Q.  Okay. And so ATS has entered into an
8  agreement with the approximately 14,000 Illinois-based
9  users relating to the collection of their biometric
10  information?
11      MR. ZEITLIN:  Objection as to form and
12  objection on the grounds that it calls for a legal
13  conclusion. You may answer.
14    A.  I -- I'm sorry. Could you repeat the
15  question?
16    Q.  Approximately 14,000 Illinois-based employees
17  have entered into and clicked "I agree" to enroll in
18  the biometric time collection device, correct?
19    A.  Correct.
20      MR. ZEITLIN:  Objection -- objection as to
21  form. You may answer.
22    A.  Correct.
23    Q.  And it's actually more than that because that
24  was just a snapshot in December of 2021, correct?
25      MR. ZEITLIN:  Same objection. You may

Page 28

1  answer.
2    A.  I -- I couldn't tell you if it was more than
3  that.
4    Q.  Well, you know there's been turnover for some
5  of your employees, don't you?
6      MR. ZEITLIN:  Same objection. You may
7  answer.
8    A.  We do know that there's been some turnover,
9  but we've also had folks come and go so I -- I couldn't
10  tell you if the number was more or less.
11    Q.  And when did Ecolab first roll out in
12  Illinois the screen that we're looking on in Exhibit 4?
13      MR. ZEITLIN:  Objection. This goes beyond --
14  the -- the date of when Ecolab rolled that out is --
15  goes beyond personal jurisdiction over Accu-Time. I'm
16  going to instruct the witness not to answer that
17  question.
18    Q.  How does Accu-Time, from a technological
19  standpoint, have the Illinois users that are utilizing
20  its biometric time clock agree? Like, how does it
21  appear on the screen? Is that something that Accu-Time
22  does in Illinois, or is that something that it does
23  from a remote location?
24      MR. ZEITLIN:  Objection as to form. You may
25  -- you may answer, if you're able.

Page 29

1    A.  I'm sorry.  Could you repeat that?  I -- I
2  didn't understand it.
3    Q.  How is it that Accu-Time was able to make its
4  Illinois-based biometric collection devices have on its
5  screen a -- the statement that we see in Exhibit 4?
6       MR. ZEITLIN:  Objection.  You may answer, if
7  you're able.
8    A.  Again, this goes back to the location of the
9  device itself and which employees are assigned by their
10 employer through Workday to use those devices.
11   Q.  Is Accu-Time the party that caused the
12 agreement that's referenced in Exhibit 4 to appear on
13 its biometric collection devices in Illinois or did a
14 third party?
15      MR. ZEITLIN:  Objection as to form and you
16 may answer, if you're -- if you're able to.
17   A.  Are you asking if -- if we put this message
18 on the screen?
19   Q.  Correct.
20   A.  Yes.                        0:36:41
21   Q.  Okay.  How did ATS have that message appear
22 on the screens of its biometric collection devices in
23 Illinois?
24      MR. ZEITLIN:  Objection as to form.  You may
25 answer, if you're able.

Page 30

1    A.  It's part of the -- the workflow of -- that's
2  built into the system for those devices.
3    Q.  So ATS is able to modify the -- its biometric
4  collection devices that are stationed in the state of
5  Illinois to have an agreement pop up on it?
6       MR. ZEITLIN:  Objection.  Again, David, I'm
7  trying to understand how this relates to personal
8  jurisdiction.  In other words, what Accu-Time's ability
9  -- what -- what its technological ability is -- is --
10 is, how does that relate to personal jurisdiction?
11      MR. FISH:  If they can manipulate devices
12 within Illinois, then we believe that that shows
13 activities in Illinois.
14      MR. ZEITLIN:  Can you -- can you repeat the
15 question?
16      MR. FISH:  I'll ask the court reporter to
17 read it back.                    0:37:52
18      RECORDER:  Okay.  One moment.  I have to
19 share my screen.  Okay.  Stop.  Go back to the left.
20      (Record replayed)
21      RECORDER:  Oh, wait.  So back a little more.
22      MR. FISH:  You know what?  I'll -- I'll just
23 ask a new question.
24      RECORDER:  Oh, okay.  Let me get out of this
25 now.

Page 31

1       (Record replayed)
2       RECORDER:  Do you want me to go farther back
3  or just --
4       MR. FISH:  No, just go where I -- where we
5  stopped talking and I'll ask a new question, please.
6    Q.  ATS was able to modify its biometric devices
7  in the state of Illinois to cause them to require the
8  14,000 employees in Illinois who use those devices to
9  enter into an agreement with ATS, correct?
10      MR. ZEITLIN:  Objection as to form and
11 objection on the grounds that it calls for a legal
12 conclusion.  You may answer, if you're able to.
13   A.  Yes, we did.                0:40:06
14   Q.  Did ATS have to come to Illinois to do that?
15      MR. ZEITLIN:  You may answer.
16   A.  No.
17   Q.  ATS was able to remotely modify its
18 Illinois-based biometric collection devices, correct?
19   A.  Correct.
20   Q.  And ATS retains control over the 154
21 biometric collection devices in the state of Illinois
22 remotely, correct?
23      MR. ZEITLIN:  I -- I'm going to object as to
24 form.  You may answer if you're able to.
25   A.  I guess what do you mean by "control"?

Page 32

1    Q.  Well, what is ATS able to do its 154
2  Illinois-based biometric collection devices remotely?
3       MR. ZEITLIN:  Objection as to form.  You may
4  answer.
5    A.  So we -- we can modify the workflow, what
6  happens that's presented on the screen, but we don't
7  have physical control of it.  We couldn't control if it
8  was moved.
9    Q.  What do you mean by "workflow"?
10   A.  The steps -- the steps in which -- the order
11 in which -- like, if someone presses a -- a punch -- a
12 punch in, punch out, whether or not they -- their
13 employer wants them to punch in and out for lunch.  We
14 can modify how many punches are required in a day.
15   Q.  And one of the reasons that ATS enacted an
16 Illinois-based biometric policy was because it didn't
17 want to get sued in Illinois, correct?
18      MR. ZEITLIN:  Objection.  Calls for a legal
19 conclusion and does not -- does not bear on the issue
20 of personal jurisdiction.  And -- and -- and calls for
21 attorney-client privileged information.
22      MR. FISH:  Are you instructing her not to
23 answer whether she --
24      MR. ZEITLIN:  I -- I --
25      MR. FISH:  -- anticipated being hauled into

Exhibit 5, LLC

Page 33

1 court in Illinois? The -- the plan to cull --
2      MR. ZEITLIN: I am --
3      MR. FISH: -- personal jurisdiction? If you
4 --
5      MR. ZEITLIN: I -- I am instructing -- I am
6 instructing her not to answer that question based on
7 those objections, too.
8      Q. Were you, as the CEO of Accu-Time, ever
9 concerned about being sued in Illinois?
10      MR. ZEITLIN: Objection. Goes -- goes beyond
11 the scope of the -- of the nine subjects in the --
12 listed in the deposition notice and also goes beyond --
13 goes beyond personal jurisdiction over Accu-Time. So
14 yes, I'm instructing her not to answer that as well.
15      MR. FISH: Well, it goes to the activities in
16 Illinois, it goes to their policies and practices, why
17 they put them into place and so, you know, that
18 certainly is -- is relevant.
19      MR. ZEITLIN: I stand on the objection and
20 instructing the witness not to answer.
21      Q. Are the statements in ATS's biometric policy,
22 Exhibit 1, true?
23      MR. ZEITLIN: Can you -- can you show us the
24 document? We don't have it.
25      MR. FISH: Of course.                    0:43:51

Page 34

1      Q. What I just want to know is are the
2 statements in Exhibit 1, the biometric policy for
3 Illinois, true to the best of your knowledge?
4      MR. ZEITLIN: We still -- still can't see it.
5 What -- what statements are you -- are you asking --
6 can you just repeat the question? I'm not sure what --
7 are you asking about a particular statement or the
8 entire thing? Or just to clarify, what -- what are you
9 asking?
10      Q. To the best of your knowledge, are the
11 statements in the Illinois biometric policy true?
12      MR. ZEITLIN: You may answer, if you're able
13 to. Do you -- do you want to see the whole thing or --
14      A. To -- well, to the best of my knowledge, yes.    0:44:51
15      Q. And ATS has agreed with its Illinois
16 customers that it would abide by its biometric policy,
17 correct?
18      MR. ZEITLIN: Objection as to form. If you
19 -- you can answer, if you're -- if you understand the
20 question.
21      A. I'm not sure if we've explicitly agreed. I
22 guess I'm not quite sure I understand the question.
23      Q. ATS has agreed to utilize biometric
24 information that's collected from its Illinois-based
25 customers in compliance with its biometric data policy,

Page 35

1 correct?
2      MR. ZEITLIN: Objection. If you understand
3 the question, you may answer.
4      A. I -- I would say that it's correct.        0:45:56
5      Q. And ATS has also agreed that for the
6 thousands of Illinois employees who are having their
7 biometric data collected in Illinois, that ATS would
8 comply with its biometric data policy, correct?
9      MR. ZEITLIN: Objection as to form and I'm --
10 also beyond the scope of personal jurisdiction, but in
11 order to move this along I -- I will not instruct the
12 witness not to answer. You may answer, if you're able
13 to.
14      A. I -- I -- I'm sorry. Could you repeat the
15 question?
16      Q. ATS has agreed with the thousands of
17 Illinois-based employees who utilize its biometric
18 collection devices that it will comply with its
19 biometric data policy, correct?
20      MR. ZEITLIN: Same objection. You may -- I'm
21 not going to -- again, I'm not going to instruct the
22 witness not to answer, but I do believe it goes beyond
23 the scope of personal jurisdiction so I object on that
24 basis. You may answer, if you're able.
25      A. So to the extent that they pressed "I agree"

Page 36

1 on that workflow screen, I would say then yes, we have
2 agreed with them that they -- we would follow those
3 practices.
4      Q. And you, as the CEO of ATS, consider that a
5 binding obligation with ATS's Illinois-based people who
6 are utilizing its biometric collection devices,
7 correct?
8      MR. ZEITLIN: Objection. Goes -- goes beyond
9 the scope of the nine topics in the deposition notice.
10 She -- she's -- Ms. -- Ms. Gladysz is called as a
11 corporate representative. What she agreed or didn't
12 agree is not the subject of the deposition. You may
13 answer. I won't instruct her not to answer. You may
14 answer, if you're able to.
15      A. I'm sorry. I've lost track of the question.    0:48:00
16      Q. ATS has agreed with the 14,000-plus workers
17 in Illinois that utilize its biometric data policy that
18 it will comply with the biometric data policy that is
19 on its Internet page, correct?
20      MR. ZEITLIN: Same objection. It goes beyond
21 personal jurisdiction. You may answer.
22      A. Yes, I would say that's true.
23      Q. I'm going to show you Exhibit 2 which is, for
24 the record, a -- can you see that?
25      A. Yes.

Page 37

1    Q.  Okay.  All right.  Stamped ATS 1.  It's
2  called "Data Flow Diagram."  Can you tell me generally
3  what this is?
4    A.  It's a depiction of how the TimeCom solution
5  works.  The blue stack, if you will, on the left-hand
6  side of the -- the diagram represents our clients --
7  our customers' ERP system, which is Workday.  The cloud
8  in the center is our -- is our middleware, ATS
9  middleware.  And then the device on the right-hand side
10  is the actual time clock.  And the diagram is -- is
11  trying to depict the flow of information back and
12  forth.
13    Q.  So when we were talking about -- earlier,
14  about the 140 -- 54 Illinois-based devices, you're
15  referring to the clock on the right-hand side of the
16  data flow diagram?
17    A.  That is correct.                    0:49:48
18    Q.  And those are actually owned by the customer,
19  right?
20    A.  That is correct.
21    Q.  Do they pay -- does ATS pay Illinois sales
22  tax when it sells them?
23    A.  Yes, unless they provide us with an exemption
24  certificate based on the type of entity they are, but
25  -- but yes.

Page 38

1    Q.  Then on the left is the Workday -- can you --
2  can you tell me a little bit more about what an ERP HCM
3  solution is?
4    A.  So it's an enterprise resource planning
5  system.  They need to have -- "they" being our
6  customer, needs a module called Workday time tracking
7  in order to be able to use our devices, but that module
8  allows them to keep track of their people's time.  It
9  calculates the hours.  It's all used to process and
10  calculate payroll.
11    Q.  Does ATS have any involvement in the Workday
12  system?
13    MR. ZEITLIN:  Objection as to form.  You may
14  answer.
15    A.  No.
16    Q.  Which company operates that?        0:51:16
17    A.  Workday.  Well, I'm sorry.  I -- I guess I'm
18  not sure what you mean by "operate."
19    Q.  So there's a company called Workday, correct?
20    A.  Correct.
21    Q.  Okay.  And it sells labor management
22  software?
23    A.  Correct.
24    Q.  And does ATS ever sell or help sell its --
25  its software?

Page 39

1    A.  No.
2    Q.  So from your diagram -- by the way, did you
3  prepare Exhibit 2 specifically for this litigation?
4    A.  No.  The only thing I -- that may have been
5  added for this litigation is the "Hosted in Northern
6  Virginia" yellow box.  I'm not sure if that exists on
7  our standard diagram.
8    Q.  What is hosted in northern Virginia?
9    A.  That's -- we -- we use Amazon Web Services
10  for server space, and the server -- the Amazon Web
11  Services' server is located in northern Virginia.
12    Q.  How do you know that?              0:52:24
13    A.  Our -- our team that -- that monitors those
14  servers, they know -- we know where it's located.  It's
15  -- I believe it's identified on our Amazon Web Services
16  invoice.
17    Q.  Where is it backed up?
18    A.  I'm not -- I don't know the answer to that.
19    Q.  Okay.
20    MR. ZEITLIN:  David -- David, at a convenient
21  time, could we take a break?
22    MR. FISH:  Sure.  How about when I'm done
23  with this exhibit?
24    MR. ZEITLIN:  Okay.
25    Q.  So to follow your diagram, the data flows

Page 40

1  from -- the -- the data that's on the device in
2  Illinois flows from the device to ATS's cloud-based
3  storage in Virginia, is that correct?
4    A.  Correct.
5    Q.  Do you know if it goes directly or is there
6  anywhere else it stops?
7    A.  I believe it goes directly.
8    Q.  How does it get there?
9    A.  Okay.  I guess that's above my expertise.
10  Through -- through an Internet connection.  I -- I -- I
11  don't know beyond that.
12    Q.  Okay.  And the information that's listed in
13  the upper right-hand corner under "Validated Employee
14  Data from Hosted Middleware to Clock," are those the
15  items that go from -- well, why don't you explain it to
16  me?  What -- what items go from the biometric
17  collection device in Illinois to time -- to ATS's
18  storage in the cloud?
19    A.  What data goes there?
20    Q.  Correct.                          0:54:29
21    A.  Is that what you said?
22    Q.  Yeah.
23    A.  Primarily punch data.  When a new employee is
24  enrolled, if they're enrolled on the device itself,
25  then that data would go into the cloud.  Some devices,

Page 41

1  depending on how the customer has wanted to use the
2  clock, there might be manager approvals, there could be
3  schedule transfers, job transfers, some employee
4  information.
5      Q.  Does the biometric data transfer from the
6  clock in Illinois to ATS's servers?
7      A.  Yes.
8      Q.  And does that happen every time they punch in
9  and out, or does it just happen when they enroll?
10     A.  It -- every time they punch in and out.
11     Q.  Then does the biometric data that ATS saves
12  on its servers get transferred to the third-party
13  Workday solution?
14         MR. ZEITLIN:  Objection as to form.  You may
15  answer.                             0:56:00
16     A.  No, it doesn't go beyond the ATS middleware
17  cloud.
18     Q.  What other companies have access to ATS's
19  middleware cloud?
20     A.  None.
21     Q.  So for each of the approximately 16 Illinois
22  customers that use the biometric data collection
23  devices in Illinois, the biometric data follows the
24  flow referenced in Exhibit 2?
25     A.  Correct.

Page 42

1      Q.  Okay.  But don't some of them have their own
2  hosting device, where they would not rely on ATS's
3  cloud?
4      A.  Not our customers, no.
5      Q.  So any ATS Illinois-based customer would rely
6  on ATS's cloud storage of its employees' biometric
7  data?
8          MR. ZEITLIN:  Objection as to form.  You may
9  answer.                             0:57:16
10     A.  Yes, any of ATS's TimeCom customers.
11     Q.  Does the biometric data also get stored on
12  the Illinois-based biometric collection device?
13     A.  Yes.
14     Q.  So essentially, the ATS cloud serves as a
15  backup to the device?
16         MR. ZEITLIN:  Objection as to form.  You may
17  answer, if you -- if you're able.
18     A.  I -- I believe it's where the matching
19  happens.  Right when a -- when an employee is
20  identifying, that template is being sent from the
21  device to the cloud and matched against the template
22  for that employee to verify that that's who they are.
23     Q.  So ATS matches the biometric information in
24  its cloud, is that correct?
25     A.  Yes.

Page 43

1      Q.  Or does that happen on the device?
2      A.  I believe it happens in the cloud.      0:58:42
3      Q.  Okay.  And does the biometric collection
4  device play any role with respect to the matching?
5      A.  It captures the image.
6      Q.  Of the biometric information?
7      A.  Yes, the sensor is -- on that diagram, that
8  little -- I guess where the blue keypad is, that lower
9  black box is where the employee presents their finger
10  so it is -- that sensor is capturing the template.
11     Q.  And by the "template," you're referring to
12  the biometric points of the finger?
13     A.  Correct.
14     Q.  Has this data flow changed at all in the last
15  five years?
16         MR. ZEITLIN:  I'm going to object.  That goes
17  beyond personal jurisdiction.  Frankly, a lot of this
18  goes beyond personal jurisdiction, but I have not
19  objected because I think you are entitled to a little
20  bit of background.  But whether or not Accu-Time has
21  changed their workflow in the last five years is
22  unrelated to personal jurisdiction and activities in
23  Illinois.
24         MR. FISH:  Are you instructing her not to
25  answer?

Page 44

1          MR. ZEITLIN:  I am.  I am.
2          MR. FISH:  Okay.  All right.  Why don't we
3  take -- you had asked for a break so --
4          MR. ZEITLIN:  Yes.                 0:59:59
5          MR. FISH:  -- we'll do that.
6          RECORDER:  Okay.  Off record, 10:01 a.m.
7          (Off the record)
8          MR. FISH:  Just to clarify --
9          RECORDER:  Back on record, 10:10 a.m.
10         Q.  Ms. Gladysz, I want to clarify one of your
11  answers.  You had mentioned that there were 14,000
12  Illinois-based employees in December of 2021 using the
13  biometric collection devices and then you referenced a
14  number of 124,000.  Was that all the employees
15  nationwide that were using it or that were using any
16  ATS clock in Illinois?
17     A.  That was the number of employees in Illinois.
18  Globally, we have over a million employees using the
19  TimeCom solution.
20     Q.  Okay.                          1:00:48
21     A.  124,000 are in Illinois, and of that 14,000
22  use biometrics.
23     Q.  Okay.
24     A.  These are approximate numbers but --
25     Q.  Understood.  And over the past five years, do

Page 45

1  you think the number has kind of been within 25 percent
2  of that -- of that figure? If -- if you looked at any
3  snapshot, what's your best estimate?
4      A. I would say the number -- if you go back five
5  years, I would say that number is much less, but I
6  couldn't tell you how much less.
7      Q. Okay. Do you think it's half?
8          MR. ZEITLIN: Objection. Calls for
9  speculation. You may answer, if you're able to.
10     A. So we have approximately 200 TimeCom
11  customers globally. In the last few years, I would say
12  we add approximately 25 to 30 per year so -- and we
13  lose a few but we probably add more, so kind of doing
14  that backwards math that number -- maybe it's half.
15     Q. Okay. How does ATS get the biometric
16  information from the Illinois-based clocks to go to its
17  -- to the ATS cloud storage?
18         MR. ZEITLIN: Objection as to form. You may
19  answer.                          1:02:25
20     A. How do we get the information?
21     Q. Yes.
22     A. The employee presents their fingerprint on
23  the sensor.
24     Q. I mean mechanically how does ATS cause the
25  biometric information that is collected to be

Page 46

1  transmitted to the ATS cloud.
2          MR. ZEITLIN: Objection as to form. You may
3  answer, if you're able.
4      A. I don't know the technicals. It -- it's
5  built into the software. I -- I couldn't tell you
6  technically how those signals or how that software is
7  coded or written or -- I -- I don't know.
8      Q. I -- and I wouldn't understand if you did.
9          MR. ZEITLIN: Okay.
10     Q. But what I -- I'm trying to get more
11  generically, it's something that ATS's software causes
12  the Illinois collected biometric information to be
13  transmitted to its -- to its cloud, is that fair?
14         MR. ZEITLIN: Objection as to form. You may
15  answer.
16     A. That -- that's correct.            1:03:20
17     Q. Okay. It's not that the customer is causing
18  the biometric information to be transmitted, it's
19  something that ATS's software does?
20     A. That --
21         MR. ZEITLIN: Objection as to form. You may
22  answer.
23     A. That is correct.
24     Q. Okay. What is Nginx ML hosting services?
25     A. It's the -- let's say the engine. I know

Page 47

1  it's in the word, but that's really the -- the TimeCom
2  middleware, the cloud on that diagram that you had
3  shown.
4      Q. And ATS owns the Nginx ML?
5      A. Yes.
6      Q. Okay. So it's the Nginx ML that drives the
7  biometric information from Illinois to ATS's cloud in
8  Virginia, correct?
9      A. I believe that's correct.            1:04:38
10     Q. So ATS's Nginx ML is constantly interacting
11  with the Illinois-based biometric collection devices
12  while they're turned on?
13         MR. ZEITLIN: Objection as to form. You may
14  answer.
15     A. I'm not sure if it's constant or if it's at
16  some frequency or interval, but yes.
17     Q. But certainly whenever the 14,000 employees
18  go to clock in every day, their fingerprint is being
19  pulled from Illinois by ATS's Nginx ML software,
20  correct?
21         MR. ZEITLIN: Objection as to form. You may
22  answer, if you know.
23     A. I'm actually not 100 percent sure if Nginx ML
24  is pulling or if the -- the firmware, the software
25  resident on the device is pushing.

Page 48

1      Q. The firmware resident on the device, you're
2  referring to the biometric collection device?
3      A. Well, the clock itself, but yes.      1:05:47
4      Q. Okay. And it --
5      A. The device itself.
6      Q. And the firmware is owned by ATS, correct?
7      A. Correct.
8      Q. How does -- how does ATS get customers in
9  Illinois to sign up for its services?
10     A. Well, we don't specifically look for Illinois
11  customers, but I would say the majority of our sales
12  leads for the TimeCom solution come from within the
13  Workday community. So whether it's a sales -- a
14  Workday sales rep -- so we have a certified integration
15  with Workday. We're one of a few time clock
16  manufacturers that do, so the sales reps know that if
17  they have a prospective customer that wants time clocks
18  then we'll get referred by the Workday sales rep. We
19  also attend Workday user conferences where we might
20  meet folks. Most of the -- I would say even in -- in
21  the early stage of a relationship we don't know where
22  the folks are located, so we're engaging with them.
23  It's not until later down the process where we actually
24  learn where they are or where they'll want to deploy
25  time clocks. The other referrals come from system

Page 49

1 integrators. Because Workday's such a big ERP system,
2 a lot of companies will hire a third party to implement
3 it, so we might get referred by those folks as well if
4 we've done business with them in the past.
5    Q. How did ATS land Ecolab as a customer?   1:07:47
6    A. I don't know how that referral came through.
7    Q. Is that the largest Illinois-based customer
8 for ATS?
9      MR. ZEITLIN: Objection as to form. You may
10 answer.
11    A. I actually don't know the answer to that
12 either. I don't know if they're the largest.
13    Q. Who are the other ATS customers in the state
14 of Illinois?
15      MR. ZEITLIN: Objection as to form, and again
16 I'm going to instruct the witness not to answer that.
17 And the identities of their customers has nothing to do
18 with personal jurisdiction.
19      MR. FISH: Well, they're Illinois-based
20 customers.
21      MR. ZEITLIN: Correct.
22    Q. What is the -- for a -- for a -- a customer
23 that has -- that's based in Illinois and -- and needs
24 approximately ten biometric collection devices
25 installed in its facility, what is the ballpark

Page 50

1 investment that that employee -- I'm sorry, that that
2 company would make with ATS to get biometric collection
3 devices set up in Illinois?
4      MR. ZEITLIN: Objection as to form. And you
5 may answer, if you're able to.
6    A. So generally, it depends on what -- what type
7 of device that they want, what features they want on
8 it, but I would say an -- an average sales price might
9 be $1,500, $1,600 per device, depending on the size of
10 the -- the -- the size of the system, the integration.
11 Maybe it's about a $25,000 implementation fee, and then
12 there's a -- a service agreement, like a customer
13 support agreement, that can range from 0 to maybe
14 $1,500, $2,000 per month. I -- I'm not sure. I -- I
15 couldn't -- I'd have -- I'd need a calculator to
16 calculate what the actual investment would be.
17    Q. So when you said $1,500 to $1,600 per device,
18 is that a -- just to purchase the device?
19    A. Correct.             1:10:14
20    Q. Okay. And then on top of that -- so if they
21 had ten devices, it would be approximately $15,000 to
22 buy the devices?
23    A. Correct.
24    Q. Okay. And then there would be -- ATS would
25 also charge the Illinois-based customer around $25,000

Page 51

1 to implement the biometric collection system?
2    A. Well, to implement the whole system, but yes.
3    Q. Okay. And then ATS has various subscriptions
4 that the Illinois-based customers can subscribe to,
5 correct?
6    A. Correct.
7    Q. Like, one is the constant support, or
8 ConstantCare?
9    A. ConstantCare, mm-hmm.
10    Q. Is that part of the $500, $1,500 per month?
11    A. Yes.
12    Q. Okay. Is that per device?
13    A. No, it's a -- it's a -- a lump -- a single
14 fee, monthly fee.
15    Q. Any other revenue that ATS would receive from
16 Illinois-based customers to sign up for their time
17 clocks?
18    A. There is a small hosting fee that is per
19 device between -- again on average, maybe $25 to $30
20 per month.
21    Q. Per device or per -- for all of them?   1:11:45
22    A. Per device, per month. And there's an
23 optional maintenance program. We call it an express
24 exchange service. So if their -- one of their clocks
25 need to -- needs to be repaired -- one of their devices

Page 52

1 needs to be repaired, they can notify us by 3 p.m. and
2 we will overnight a replacement device to them and they
3 return the -- the broken device.
4    Q. Kind of like insurance on their devices?
5    A. Almost like a maintenance plan.
6    Q. Okay.
7    A. Equipment maintenance plan.
8    Q. And so the Illinois-based customers that
9 subscribe to the maintenance plan understand that when
10 their clocks break, ATS will replace it with an
11 overnight one, correct?
12    A. Correct, for those that -- that opt for that
13 service, correct.
14    Q. And does ATS arrange for the device to be
15 shipped from Illinois back to ATS?
16      MR. ZEITLIN: Objection as to form. You may
17 answer, if you're able.
18    A. We don't arrange for the shipment. Well, I
19 guess we do. So they -- we overnight a device to them.
20 Included in that is return -- a return shipping label,
21 so then they package up the broken device and ship it
22 back to us.
23    Q. Tell me how the Illinois customers who have
24 the ConstantCare -- how that works. What -- what is
25 that?

Page 53

1    A.  All of the customers have ConstantCare -- all
2  of our TimeCom customers.  It's required.  It really
3  provides them with customer support.  There are
4  different levels of it that have differing degrees of
5  response time.  If someone wants 24/7 response from our
6  customer care team, then they would opt for the -- the
7  highest tier of support.  It also provides them with
8  upgrades, most security upgrades, upgrades to the
9  system, updates to the system.
10    Q.  So ATS, after it makes an initial sale, has
11  an ongoing maintenance relationship with its
12  Illinois-based customers?
13        MR. ZEITLIN:  Objection as to form.  You may
14  answer.
15    A.  Yes, with all of our TimeCom customers, yes.    1:14:28
16    Q.  And it provides all of its support remotely,
17  right?  It doesn't send people to Illinois?
18    A.  That is correct.
19    Q.  And that's because all the repairs can be
20  made remotely on the ATS clocks, correct?
21        MR. ZEITLIN:  Objection as to form and goes
22  beyond the scope.  You may answer.
23    A.  Not the device repairs.  The -- the -- the
24  physical -- the repairs to the equipment, the device
25  itself, those need to come back to our facility here in

Page 54

1  Connecticut.
2    Q.  From a technical standpoint, how is ATS able
3  to repair something in Illinois without actually being
4  physically located here?
5        MR. ZEITLIN:  Objection as to form.  You may
6  answer.
7    A.  That's what I just said.  We can't.  That's
8  why the device has to come to Connecticut.
9    Q.  But there's certain service that can be done
10  remotely, correct?
11        MR. FISH:  Hello?
12    A.  What do you mean by "service"?
13    Q.  Is ATS able to do any remote repairs of the
14  biometric collection devices?
15        MR. ZEITLIN:  Objection as to form.  You may
16  answer.                                             1:15:47
17    A.  What -- what -- I guess what do you mean by
18  "repairs"?
19    Q.  Well, give me an example of something that
20  might go wrong with a biometric collection device, like
21  with the software on it.
22    A.  So -- okay.  So it could -- it could stop
23  communicating with the middleware, and then that would
24  generally prompt a call from a customer service -- a
25  customer to our customer service department that would

Page 55

1  say, "You know, our clock is not connecting.  It's not
2  sending data."  Because they could see that in -- in
3  their Workday ERP that it wasn't receiving data.  So a
4  call to our customer service team would help them
5  troubleshoot.  You know, is it -- has it lost its
6  Internet connection?  Is it plugged in?  Does it need
7  to be rebooted?  It needs to have someone on --
8  physically at the customer's site, an employee of the
9  customer working on it, but it would be through phone
10  -- generally, a phone conversation with our customer
11  support team.
12    Q.  Okay.  So ATS provides phone support to its
13  Illinois-based customers on an ongoing basis?
14        MR. ZEITLIN:  Objection as to form.  You may
15  answer.                                             1:17:16
16    A.  That's correct.  As needed.
17    Q.  And does the -- does the ConstantCare
18  automatically monitor the Illinois-based time clocks to
19  make sure that they're operating correctly?
20    A.  ConstantCare, no.  I mean ConstantCare is
21  just a -- product name.  It's what we call it.  It's
22  a service-level agreement.  I guess that's what we also
23  call it.  It just provides them the access to our team.
24  We have a devops department that monitors the databases
25  in the instances.

Page 56

1    Q.  What was the name of it?
2    A.  Devops.
3    Q.  Can you spell that?
4    A.  D-e-v-o-p-s.
5    Q.  Does that stand for something?
6    A.  Yes, I think it's development operations but
7  I actually don't know what the "dev" is.  The "ops" is
8  operations.
9    Q.  How does the devops ATS department constantly
10  monitor the Illinois-based time clocks to make sure
11  that they're operating correctly?
12    A.  Sorry.
13        MR. ZEITLIN:  Did you freeze or did we
14  freeze?                                             1:18:46
15        WITNESS:  Somebody --
16        MR. ZEITLIN:  We lost --
17        WITNESS:  Somebody froze.
18        MR. ZEITLIN:  We lost you for ten seconds or
19  so.
20    Q.  Okay.  How do -- how does the develop -- or
21  strike that.  How does the devops team at Accu-Time
22  constantly monitor the Illinois-based time clocks to
23  make sure that they are operating correctly?
24        MR. ZEITLIN:  Objection as to form.  You may
25  answer.

Page 57

1    A.  So they have -- and I don't know what the
2  right technical term is, but they have access to the
3  Amazon Web Services -- the -- the middleware, the Nginx
4  ML, and so they, I believe, have alerts set up that
5  would notify them if something weren't -- I -- I don't
6  know if it's for every device but -- but there are
7  alerts set up so that they can monitor that the system
8  is up and running.
9    Q.  Does ATS also monitor the biometric
10 collection devices themselves in Illinois to make sure
11 that they are operating correctly?
12   A.  No.                          1:19:48
13   Q.  Does the middleware that ATS owns monitor the
14 biometric collection devices and provide, like, an
15 automatic notification if there's a malfunction?
16   A.  I don't believe that's -- no, I do not
17 believe so.  Not -- not in an individual device, no.
18   Q.  One of the benefits of the ConstantCare
19 support is that TimeCom monitor provides access to
20 terminal health monitoring, activity event logging, and
21 other diagnostic features, correct?
22   A.  Correct.                      1:20:35
23   Q.  And when you're talking about terminal health
24 monitoring, are you referring to the biometric
25 collection device?

Page 58

1    A.  The device as a whole, yes.
2    Q.  And how does ATS access the biometric
3  collection device to monitor its health on an ongoing
4  basis?
5    A.  I don't know how specifically it accesses it
6  other than it's connected, again, through the Internet
7  connection.
8    Q.  Do you know how often ATS is pinging the
9  biometric collection devices to make sure they're
10 operating correctly?
11       MR. ZEITLIN:  Objection as to form.  You may
12 answer, if you -- if you're able to.
13   A.  I don't know how often it -- it -- how often
14 it pings.
15   Q.  I mean, is it something that's, like, every
16 few seconds, every hour, every day?  Do you have any
17 idea of a ballpark?
18   A.  I would say every few minutes if I had to
19 guess.
20   Q.  Okay.  So it's sort of an ongoing, continuous
21 process of ATS monitoring what's happening on the
22 biometric collection devices in Illinois?
23       RECORDER:  You froze again.
24       MR. ZEITLIN:  Objection as to form.  You may
25 answer.

Page 59

1    A.  When you say, "ATS monitoring," I think we
2  have the ability to go in and look, but it's not that
3  we're monitoring it constantly, if that makes sense.
4    Q.  Okay.  One of the other benefits of working
5  with ATS is that ATS is able to provide reports to its
6  Illinois-based customers, correct?
7        MR. ZEITLIN:  Objection as to form.  You may
8  answer.
9    A.  I'm not entirely sure what type of form or
10 reports we can provide.
11   Q.  Are -- are you aware of whether ATS can
12 provide its Illinois-based employees with a list of the
13 people who were biometrically enrolled in one of its
14 clocks?
15       MR. ZEITLIN:  Are you asking about ATS's
16 Illinois-based employees?
17       MR. FISH:  Yes.                1:22:51
18       MR. ZEITLIN:  Objection as to --
19       MR. FISH:  No, I'm sorry.  I'm sorry.
20   Q.  ATS can provide its customers with a list of
21 the customer's Illinois-based employees who were
22 enrolled in ATS's biometric clocks, correct?
23   A.  Yes.
24   Q.  Okay.  And how does ATS do that?
25   A.  We -- we would have to go into the customer's

Page 60

1  database and, similar to what we've talked about
2  before, look at the devices, look at who's assigned to
3  those devices, and be able to run a -- run a report.
4    Q.  And is it a pretty regular process that
5  Illinois-based customers ask ATS for reports about
6  their employees?
7        MR. ZEITLIN:  Objection as to form.  You may
8  answer, if you're able.
9    A.  No, I'm not aware of the request, no.
10   Q.  Does ATS ever install equipment itself in
11 Illinois?
12   A.  No, we do not.                 1:24:08
13   Q.  Does ATS contract with companies in Illinois
14 to install equipment for employees?
15       MR. ZEITLIN:  What -- what -- what -- at what
16 point -- what time period are you referring to, David?
17   Q.  Well, has the answer changed over the past
18 five years in terms of whether --
19       MR. ZEITLIN:  Objection as to form.
20   Q.  Does -- does --
21       MR. ZEITLIN:  Objection as to form.
22   Q.  In the past five years, has ATS contracted
23 with companies to install biometric collection devices
24 in Illinois?
25       MR. ZEITLIN:  Objection as to form and scope,

Page 61

1 but you may answer.
2      A.   Yes, ATS contracts with a third party for
3 installation services.
4      Q.   And in Illinois, which third party is that?
5          MR. ZEITLIN:  Object -- objection as to form
6 and -- and beyond the scope.  Who ATS --
7          MR. FISH:  Are you -- I don't know if the --
8 let me ask the court reporter.  Are they freezing on
9 your end?
10         RECORDER:  Yes, they are.          1:25:14
11         MR. FISH:  Okay.  I -- I think the Internet
12 problem is on your end because both for me and the
13 court reporter said it was frozen.
14         MR. ZEITLIN:  Oh, okay.
15         WITNESS:  Okay.
16         MR. ZEITLIN:  Yeah, it must have frozen up
17 again.  We didn't realize that.  It must have only been
18 a couple seconds.
19         MR. FISH:  Okay.
20         MR. ZEITLIN:  You want to repeat -- if you
21 want to repeat the question --
22         MR. FISH:  Sure.
23     Q.   Which company does ATS contract with in
24 Illinois to install biometric collection devices?
25         MR. ZEITLIN:  Okay.  And hopefully, the court

Page 62

1 reporter got my objection to that.  The identity of
2 ATS's customers or ATS's contractors is not related to
3 personal jurisdiction and has not been -- that the
4 court has specifically limited discovery to personal
5 jurisdiction, so I'm going to instruct the witness not
6 to answer that question.
7      Q.   What does -- in the equipment installation
8 process, one of the things ATS tells its customers is
9 that it installs time clocks in compliance with the
10 Americans with Disabilities Act and local codes and
11 regulations.  What does ATS do in Illinois to assure
12 that its time clocks are installed in compliance with
13 Illinois-based laws?
14         MR. ZEITLIN:  Objection.  Goes beyond the
15 scope, but you may answer if you know.
16     A.   We provide guidance on how to install it and
17 I think, with respect to the ADA, it's -- it's the
18 height of the -- I think it's 48 inches from the ground
19 so we -- we just provide them the installation
20 instructions.
21     Q.   ATS tells its Illinois-based customers prior
22 to them being hired that ATS provides all the equipment
23 integration, deployment, and installation for the
24 project, correct?
25         MR. ZEITLIN:  Objection as to form.  What --

Page 63

1 what time period are you referring to?
2          MR. FISH:  In the last five years.      1:27:22
3          MR. ZEITLIN:  Same objection.  You may
4 answer, if you know.
5      A.   So we -- the -- the installation is provided
6 only if they want us to and it doesn't happen all that
7 -- the majority of folks install it themselves, but the
8 other stuff I believe -- I believe what you said is --
9 is true, but the installation is not with every
10 customer engagement.
11     Q.   What's your best estimate with respect to the
12 number of Illinois-based customers that self-installed
13 their equipment in the past five years?
14     A.   I am only aware of two that were -- that we
15 -- they hired us to do the installation and "us" being
16 through the third party.
17     Q.   And when a third party is hired to install
18 equipment in Illinois, ATS still coordinates for the
19 project to be done, correct?
20         WITNESS:  Shoot.  How --
21         MR. ZEITLIN:  We -- we lost you for a couple
22 seconds there.
23         WITNESS:  It froze again.          1:28:28
24     Q.   When a third party does installations for
25 Illinois-based customers, ATS coordinates for the

Page 64

1 project to be done, correct?
2          MR. ZEITLIN:  Objection as to form.  You may
3 answer, if you're able.
4      A.   Correct.
5      Q.   Like, for instance, ATS does schedule,
6 delivery, technician, and project management, correct?
7          MR. ZEITLIN:  Objection as to form.  You may
8 answer, if you're able.
9      A.   Correct.  We tell them where the location is
10 and how many devices are being installed.
11     Q.   So ATS sort of coordinates between the
12 installer and the Illinois-based customer to make sure
13 that the Illinois-based installation is done correctly?
14         MR. ZEITLIN:  Objection as to form.  You may
15 answer.
16     A.   Correct.
17     Q.   Does ATS train its Illinois-based customers
18 on how to accurately place a finger on a biometric
19 scanning device?
20     A.   Yes, we include a finger placement card --
21 information card, if you will, on how to correctly
22 place the finger on the device.
23     Q.   And why does ATS tell its Illinois-based
24 customers about how they should have their employees
25 place their finger on a biometric collection device?

Page 65

1    MR. ZEITLIN: Objection. Goes beyond the
2 scope of the questions and doesn't relate to personal
3 jurisdiction, so I will instruct the witness not to
4 answer that.
5    Q.  Are there any of the Maximus time clocks in
6 Illinois that ATS sells?
7    A.  I -- I don't know the answer to that.      1:30:48
8    Q.  Are those biometric collection devices?
9    A.  They can be.  They can be equipped with a
10 biometric sensor.
11    Q.  Does ATS provide non-warranty work to
12 Illinois-based customers on their biometric collection
13 devices?
14    MR. ZEITLIN: Objection as to form and -- and
15 scope.  What -- can you explain what you're -- I'm not
16 sure I understand.
17    Q.  ATS has a warranty on the products that it
18 sells in Illinois, correct?
19    RECORDER:  Froze up again.
20    MR. FISH:  Okay.  Can you guys hear me?
21    MR. ZEITLIN:  -- hear us?
22    MR. FISH:  Yeah, now we can.  You froze up.
23    MR. ZEITLIN:  Okay.  For some reason --
24    WITNESS:  I don't -- I don't --
25    MR. ZEITLIN:  -- we're freezing up a bit more

Page 66

1 the last few minutes.
2    MR. FISH:  Okay.                           1:31:53
3    WITNESS:  I don't know what's happening.
4    Q.  Illinois -- there, strike that.  ATS provides
5 warranty coverage for the biometric collection devices
6 that it sells in Illinois, correct?
7    A.  Yes, our standard is one year from the date
8 of purchase.
9    Q.  So in other words, if one of the ATS devices
10 has some type of malfunction, ATS continues to support
11 that equipment when it's located in Illinois, correct?
12    MR. ZEITLIN: Objection as to form.  You may
13 answer.
14    A.  Right, it would need to be returned to our --
15 our Windsor facility, but yes.
16    Q.  Sometimes, though, things break and those are
17 not covered under a warranty, right?
18    A.  Could be potentially, yes.             1:32:43
19    Q.  Or it could be that equipment is out of
20 warranty, right?
21    A.  Yes.
22    Q.  So when something is not covered by an ATS
23 warranty in Illinois and work needs to be performed,
24 does ATS bill its Illinois customers for that work?
25    A.  Yes.

Page 67

1    Q.  And do you know how much revenue ATS has
2 collected from its Illinois-based customers for
3 non-warranty work on its biometric collection devices?
4    MR. ZEITLIN: For what -- what time period
5 are you referring to?
6    Q.  Do -- do you have any yearly figures or
7 anything like that?
8    A.  I -- I don't know that number.  We don't
9 track our revenue by state or by geography.
10    Q.  But ATS has a department that helps repair
11 non-warranty covered items in Illinois?
12    A.  We have a -- we have a service department,
13 yes.
14    Q.  Okay.  Do you know who Jim Cox is?
15    A.  I do.                                  1:34:01
16    Q.  Is he based in Illinois?
17    MR. ZEITLIN: Objection as to form.  You may
18 answer, if you -- if you know.
19    A.  He was.
20    Q.  He was the -- he was a vice president for
21 Accu-Time, correct?
22    A.  He was -- his title was vice president, yes.
23    Q.  And ATS actually listed that he had an office
24 in Oak Brook, Illinois, correct?
25    A.  That is correct.

Page 68

1    Q.  Okay.  And why did ATS list that it had an
2 employee available to work in Oak Brook, Illinois?
3    MR. FISH:  You -- you -- you froze again.
4    MR. ZEITLIN:  Okay.  Well, now we -- now we
5 can see you and hear you.
6    Q.  Why did ATS publicly list that it had an
7 employee, a vice president, working in Oak Brook,
8 Illinois?
9    MR. ZEITLIN: Objection as to form.  The --
10 you're asking for the reason ATS listed having an
11 employee in Illinois?
12    MR. FISH:  Yeah.
13    MR. ZEITLIN:  And what -- what -- what topic
14 does that go to?                              1:35:25
15    MR. FISH:  It's activities in Illinois.
16    MR. ZEITLIN:  The -- the -- the reason -- you
17 -- you want to know the reason why.  How does that go
18 to activities in Illinois?  She -- she just testified
19 that she had an employee in Illinois.  How is the
20 reason --
21    MR. FISH:  I -- I'd like to find out.  That's
22 why I'm asking questions, because I don't know why he
23 --
24    MR. ZEITLIN:  I -- I'm going -- I'm going to
25 -- I'm going to object.  I -- the witness can answer,

Page 69

1 if she knows, but I'll -- I'll object. I think it goes
2 beyond the scope of the deposition.
3    A. I'm not sure why we listed it other than we
4 listed the locations of where we had salespeople.
5    Q. And ATS paid for Jim Cox's office in Oak
6 Brook, Illinois, when he worked for ATS, correct?
7       MR. ZEITLIN: Objection as to form. You may
8 answer.                                1:36:15
9    A. That is correct. We rented space for him.
10    Q. During what period of time did Mr. Cox work
11 for ATS?
12       MR. ZEITLIN: Objection. Beyond the scope
13 but you may answer.
14    A. He was hired, I believe, in 1993 and he
15 retired in 2017.
16    Q. All right. And in 2017 when Mr. Cox retired,
17 did ATS also close its Illinois-based office?
18    A. Yes.
19    Q. Was Mr. Cox the only ATS employee who worked
20 in Illinois?
21    A. Yes.
22    Q. Does Ryan McColgan -- McColgan work in
23 Illinois?
24    A. No.
25    Q. What state does he work out of?

Page 70

1    A. Both Connecticut and Massachusetts.
2    Q. Does Jim Cox ever do ongoing consulting for
3 ATS?
4    A. No.                                1:37:19
5    Q. Mr. Cox, what were his duties in 2017 for
6 ATS?
7       MR. ZEITLIN: Objection. Goes beyond the
8 scope and beyond the personal jurisdiction, but I'll --
9 I'll instruct the witness not to answer (sic). You can
10 answer, if you know.
11    A. He was a salesman.
12    Q. He sold ATS biometric collection devices
13 within the state of Illinois?
14       MR. ZEITLIN: Same objection. You may
15 answer.
16       MR. FISH: I think you froze again.
17    A. He was based in Illinois -- all over.
18    Q. So Jim Cox, through 2017, actually made sales
19 from within the state of Illinois, correct?
20       MR. ZEITLIN: Objection as to form and it --
21 you may answer, if you're able to.
22    A. He -- he nurtured relationships but he did
23 not have the authority to bind the company in any
24 agreements.
25    Q. What do you mean by Jim Cox nurtured

Page 71

1 relationships?
2    A. Well, he was a salesperson so he would follow
3 up on leads. He would talk to the customers about our
4 equipment or our solutions, our offerings.
5    Q. And for the customers based in Illinois, he
6 would sometimes go there in person, would he not?
7    A. I'm not aware of him visiting any customers
8 in Illinois.
9    Q. Did you know one way or the other?
10       MR. ZEITLIN: Objection. You may answer.
11    A. I -- I can't say for sure that he never
12 visited a customer. I just don't -- I'm not aware of
13 any that are in Illinois that he would have visited.
14    Q. Why did ATS rent an office for him as opposed
15 to just having him work out of his house, for instance,
16 in Illinois?
17       MR. ZEITLIN: Objection. Objection. That
18 goes beyond the scope and certainly beyond personal
19 jurisdiction, so I -- I will instruct the witness not
20 to answer that.
21    Q. Does ATS -- in the past five years, has it
22 ever leased its equipment within the state of Illinois?
23    A. No.                                1:40:00
24    Q. Are you aware of whether ATS ever, as part of
25 the sales process to Ecolab in Illinois, made a

Page 72

1 PowerPoint presentation?
2       MR. ZEITLIN: Objection as to form. You may
3 answer.
4    A. I -- I was not a party to it so I don't know
5 for sure, but it typically is part of our sales
6 process.
7    Q. And is that a -- when -- that's basically a
8 sales pitch that's done online, is that correct?
9       MR. ZEITLIN: Objection as to form. You may
10 answer.
11    A. Through a video conference such as the one
12 we're using right now, yes.
13    Q. Do you know whether anybody from Ecolab -- or
14 sorry, strike that. Do you know whether anybody from
15 ATS ever traveled to Illinois to meet with anybody at
16 Ecolab?
17    A. No, I don't believe that they did.
18    Q. Do you know what -- one way or the other?     1:41:04
19    A. With absolute certainty? No. I do know that
20 Ecolab started as a Canadian installation and so the
21 initial engagement was with representatives in Canada.
22 And actually, could you repeat that question again?
23    Q. I forgot it.
24       RECORDER: Do you want me to go back?
25       MR. ZEITLIN: Sure.

Page 73

1      RECORDER: Okay. Here. Share screen.
2         (Record replayed)
3      WITNESS: No, no, that's fine, yes.
4      A. Yeah, I -- it -- it was -- I -- I wasn't sure
5   if it was about the travel, so yes. No, I don't
6   believe that anybody traveled to Illinois, and I'm
7   pretty confident about that.
8      Q. To your knowledge, in the past five years has
9   ATS attended any trade shows or conferences in the
10   state of Illinois?
11      MR. ZEITLIN: Objection. You may answer, if
12   you're able to.
13      A. Within the last five years, yes, I am aware
14   of some.
15      Q. Okay. Which -- which ones?          1:43:38
16      A. I believe it was a Campus -- Campus Tech
17   trade show and possibly a Workday Rising event, a
18   Workday event. These would have been before 2018.
19      Q. What was the purpose of those conferences?
20      MR. ZEITLIN: Objection. You may answer.
21      A. So as -- at Workday Rising events, we usually
22   attend -- sometimes we might have a --
23      Q. Can you -- can you do your question -- answer
24   over? It froze.
25      A. Sure. Sure. So we attend Workday events.

Page 74

1   We might -- sometimes we'll have a booth to show --
2   display the time clocks, talk to users who might need
3   time clocks. The Campus Tech trade show, we do have
4   some higher education institutions who are TimeCom
5   customers, and so it was a -- would be an opportunity
6   to showcase the time clock devices to higher education
7   institutions who might need them.
8      Q. Does ATS do any advertising that ends up in
9   the state of Illinois, to your knowledge?
10      A. It -- most of it is through the Web or the
11   Internet. Who views it, I couldn't tell you where
12   they're located.
13      Q. What does ATS do to get leads in Illinois?
14      MR. ZEITLIN: Objection as to form. You may
15   answer.                          1:45:23
16      A. We don't specifically look for leads in
17   Illinois. We look for leads globally. But again it's
18   through the relationship with Workday, with their sales
19   team, attending Workday events. We work with system
20   integrators so we get referrals through there. And we
21   do email -- broadcast email blasts, but again they're
22   not geographic specific.
23      Q. But certainly, ATS reaches out to prospective
24   customers located within the state of Illinois,
25   correct?

Page 75

1      MR. ZEITLIN: Objection as to form and scope,
2   but you may answer if you're able.
3      A. Well, generally they come to us. Once --
4   maybe someone responds or reacts to an email that they
5   received and they reach out to us. Could they be
6   located in Illinois? Yes.
7      Q. If ATS doesn't do any business in Illinois,
8   why is it registered with the Illinois secretary of
9   state?
10      MR. ZEITLIN: Objection as to form, and I'm
11   going to instruct the witness not to answer that
12   question. It's not -- doesn't go to personal
13   jurisdiction, why ATS is registered with the -- with
14   the Illinois secretary of state.
15      Q. Well, does ATS do business in the state of
16   Illinois?
17      MR. ZEITLIN: Objection. I think we've just
18   been spending the last two hours discussing the
19   business ATS does in Illinois, so I think that
20   question's been asked and answered, but you may answer
21   it again if you like.
22      A. Well, I'm actually not clear on the
23   definition of "doing business" according to the
24   secretary of state.
25      Q. What does ATS do within the state of

Page 76

1   Illinois?
2      MR. ZEITLIN: Objection as to form. If you
3   happen to understand the question, you may -- you may
4   answer.
5      Q. You froze again.                  1:47:30
6      A. Customers who might have --
7      Q. Can you -- can you start over?
8      A. -- locations in Illinois.
9      Q. I'm sorry. You froze again. Can you start
10   over?
11      A. Yeah. No, that's okay. I -- I mean I don't
12   think we do really anything in the state of Illinois
13   other than remotely provide services to the customers
14   that have locations in Illinois.
15      MR. FISH: Okay. Let me take a short break.
16   I -- if I have more, it won't be much.
17      MR. ZEITLIN: Okay.
18      WITNESS: Okay.
19      RECORDER: Off record, 10:58 a.m.        1:48:12
20         (Off the record)
21      RECORDER: Back on record, 11:03 a.m.
22      Q. In the answers to personal jurisdiction
23   interrogatories that Accu-Time -- it responded that, to
24   the best of its knowledge, Ms. Seals, one of the
25   Plaintiffs in this case, consented to the collection of

Page 77

1  her biometric information in October of 2020. What do
2  you know about that?
3      MR. ZEITLIN: I'm going to object. I'm going
4  to object on the grounds that I -- I don't believe that
5  that falls within the scope of any of the nine
6  subjects, but I won't instruct the witness not to
7  answer. If you're able to answer and you know the
8  answer, by all means go ahead.
9      A.  So I'm sorry. Could you repeat the question?
10     Q.  Why does Accu-Time believe that Mrs. Seals,
11  one of the Plaintiffs in this case, consented to the
12  collection of her biometric information in October of
13  2020?
14      MR. ZEITLIN: Same objection. You may
15  answer.
16     A.  So I believe that there is a -- something
17  within the system that indicates that she selected "I
18  agree" at that time.
19     Q.  And was that the first time that she had used
20  the biometric collection device?
21      MR. ZEITLIN: Object -- same objection but
22  you may answer.
23     A.  I don't know. The way that the workflow
24  works, yes.
25     Q.  Well, was October 2020 when ATS rolled out

Page 78

1  the "I agree" screen?
2      MR. ZEITLIN: I -- I'm going to object and
3  instruct the witness not to answer. That does not go
4  to personal jurisdiction. That when -- when ATS rolled
5  out a screen does not -- not go to jurisdiction.
6      Q.  So ATS keeps records of which Illinois-based
7  employees entered into agreements with it to collect
8  their biometric information?
9      MR. ZEITLIN: Objection as to form. You may
10  answer, if you're able to.
11     A.  I'm sorry. Could you repeat the question?
12     Q.  ATS keeps records of which Illinois-based
13  employees consented to have their biometric information
14  collected, is that correct?
15      MR. ZEITLIN: Same objection. You may
16  answer.
17     A.  Yes.                              1:50:52
18     Q.  Okay. And is that through an electronic log
19  showing the time and date?
20      MR. ZEITLIN: Same -- same objection and --
21  and beyond the scope of -- of the personal jurisdiction
22  -- the -- the court's order, but you may answer.
23     A.  Yes, I believe so. I haven't personally
24  viewed it, but I believe so.
25     Q.  Do you know where those records are kept?

Page 79

1  Are they within the state of Illinois?
2      MR. ZEITLIN: Same objection. You may
3  answer.
4      A.  No, they're in the Amazon Web Services domain
5  -- cloud.
6      Q.  ATS also put in its answers to personal
7  jurisdiction interrogatories that Ms. Franchini did not
8  use any biometric features on any ATS time clock. What
9  is the -- what's your understanding of the factual
10  basis for that statement?
11      MR. ZEITLIN: Same -- same objection. I --
12  again, I don't think it calls with -- falls within any
13  of the nine subjects listed for today's deposition.
14  You may answer, if you're able to.
15     A.  We couldn't find a record in our system of
16  her using a time clock.
17     Q.  I thought the records were deleted once they
18  were no longer employed.
19     A.  Within --
20      MR. ZEITLIN: Same objection. You may
21  answer.                                  1:52:21
22     A.  Yeah, within -- I forget if it's 75 or 80
23  days after -- after that. However, the consent records
24  are kept longer.
25     Q.  Well, what if she used the biometric

Page 80

1  collection device in Illinois before ATS had the
2  consent form on the clock? Then would that not show?
3      MR. ZEITLIN: Objection as to form and beyond
4  the scope of the -- of what was designated for today's
5  deposition. You may answer, if you're able.
6      A.  I'm sorry. Could you repeat the question?
7      Q.  If Ms. Franchini had utilized the biometric
8  collection device in Illinois prior to the time that
9  ATS rolled out the screen requiring employees to click
10  "I agree," would ATS have had a record of her use of
11  the clock?
12      MR. ZEITLIN: Objection as to form and same
13  objections as before. You may answer.
14     A.  So I can't speak to what we would have had
15  other than we could not find any record of her in our
16  system.
17     Q.  Do you have any explanation for that -- of
18  why that might be?
19      MR. ZEITLIN: Same -- same objections.
20  Beyond the scope and goes -- goes beyond the issue of
21  personal jurisdiction. You may answer, if you're able.
22     A.  Because we don't have any data. I don't -- I
23  don't -- the data would have been deleted, I guess.
24  I'm sure -- I'm sorry, I don't know.
25     Q.  What data would have been deleted?    1:53:58

Page 81

1     MR. ZEITLIN: Same objections. You may
2 answer, if you're able.
3     A. So you're asking -- so we do not have a
4 record of her in our system, so if she used it and we
5 don't have the data, my assumption is then it was
6 deleted.
7     Q. And why would it have been deleted?
8     MR. ZEITLIN: Same objections. You may
9 answer, if you're able.
10    A. Because the time period has gone by.
11    Q. The 75 or 80 days?
12    A. Or she's no -- or she was no longer an
13 employee. I -- I -- I don't know.
14    Q. Okay. Both --
15    A. I -- I would be -- I would be speculating.
16    Q. Okay. But both of those items, either the 75
17 or 80 days passed or her no longer being an employee,
18 would be logical answers as to why she was not in the
19 system?
20    MR. ZEITLIN: Same -- same objections and
21 calls for speculation. You may answer.
22    A. Correct.                        1:54:54
23    Q. Okay. What does ATS do to make sure that
24 when Illinois-based employees are no longer working for
25 one of its customers their biometric information is

Page 82

1 deleted?
2     MR. ZEITLIN: No, no, that -- objection.
3 That goes beyond the scope of personal jurisdiction.
4 You -- I'm going to instruct the witness not to answer
5 that.
6     Q. What does ATS do to monitor the ATS biometric
7 collection devices in Illinois to assure that, once an
8 employee separates, their biometric information is off
9 of the terminal that's located in Illinois?
10    MR. ZEITLIN: Same objection.
11    MR. FISH: Are you instructing her not --
12    MR. ZEITLIN: Unless I don't -- unless I
13 don't -- can you -- can you rephrase the question?
14 It's -- it's -- it's a little confusing, so maybe it's
15 -- maybe it's okay but I -- I don't really understand
16 enough -- I don't really understand what you're asking,
17 so.
18    Q. Biometric templates are kept on the
19 customer's time clock in Illinois, correct?
20    A. Correct.                        1:56:11
21    Q. What, if anything, does ATS do to make sure
22 that, when an employee separates, the biometric
23 template is taken off of the collection device that's
24 located in Illinois?
25    MR. ZEITLIN: That -- that goes beyond

Page 83

1 personal jurisdiction. I'm going to instruct the
2 witness not to answer.
3     Q. Cool. I'm showing you what was marked as
4 Exhibit 5 which -- can you see it?
5     A. Yes.
6     Q. Okay. Just kind of generically, I'll flip
7 through. And all I'm going to ask you is this, if this
8 is ATS's standard sales order and sales contract?
9     A. Yes, correct, for -- for TimeCom, yes.
10    Q. Lovely. For the record, this is stamped 4
11 through 22. On the -- the last few pages, one is
12 titled "Equipment Installation," "Express Exchange
13 Service," "ConstantCare Support," those truly and
14 accurately describe the services that are provided to
15 ATS's Illinois-based customers, correct?
16    MR. ZEITLIN: You're -- you're talking about
17 pages 4 to 22, David?
18    MR. FISH: No, 20 to 22.
19    MR. ZEITLIN: We have a hard copy so she's
20 just looking at that.
21    MR. FISH: Oh.
22    MR. ZEITLIN: We thought that might be
23 easier.
24    MR. FISH: Sure.                     1:57:50
25    A. Yes, so --

Page 84

1     Q. I just want to --
2     A. So those pages are the service descriptions.
3 That is correct.
4     Q. Okay. And they truly and accurately describe
5 the work that ATS performs for its Illinois-based
6 customers?
7     A. Without having -- reading through them, I --
8 I believe so. I don't recall the last time that these
9 were updated, but I would have to read through them to
10 be 100 percent certain.
11    Q. Under the Express Exchange Services, it
12 references that when a biometric collection device is
13 returned to ATS, the terminal will be refurbished and
14 placed in the EES inventory pool. What does EES stand
15 for?
16    A. Express Exchange Service.            1:59:06
17    Q. So when ATS gets a biometric collection
18 device from an Illinois customer and is going to resell
19 it as a refurbished device, what does ATS do to ensure
20 that the biometric information is wiped off of it?
21    MR. ZEITLIN: Objection as to form. You may
22 answer, if you're able.
23    A. So we don't resell them. These -- these
24 devices stay within a pool to be used for EES, but our
25 service repair department that services all -- all --

Page 85

1  all equipment coming from all sources, resellers and
2  both TimeCom, they -- when the clock is first received,
3  they -- they delete all of the data that's on it if --
4  to the extent that there's anything there and then they
5  begin the repair process.
6        MR. FISH:  Okay.  Those are my only
7  questions.  Thank you for your time.
8        MR. ZEITLIN:  Thank you.
9        RECORDER:  Oh, okay.  Signature?
10       MR. ZEITLIN:  Yeah, the -- it -- we -- we --
11  the witness reserves the right to -- to read and sign,
12  yes.
13       RECORDER:  Okay.  Off record, 11:15 a.m.
14
15
16
17
18
19
20
21
22
23
24
25

Page 86

1            CERTIFICATION
2    I certify that the deponent was duly sworn by me and
3       that the foregoing is a true and correct
4       transcript from the record of proceedings
5            in the above-entitled matter.
6
7
8         Kristyn Simpson
9         February 11, 2022
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25