UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EDNA FRANCHINI, individually and on behalf of all others similarly situated, *et al.*, ) ) ) Plaintiffs, ) ) v. ) ) ACCU-TIME SYSTEMS, INC., ) ) Defendant. ) ) | Case No. 21-cv-5075 Hon. Steven C. Seeger |

## ORDER

Illinois isn't known for tsunamis. But it is hard to think of another word to capture the wave of litigation that has hit courthouses across the state ever since the legislature passed the Illinois Biometric Information Privacy Act in 2008.

By and large, the cases fall into two categories. Sometimes the cases target an employer who required its employees to clock in and out of work by scanning their fingerprints. And sometimes the cases take aim at the company that produced the hardware or software in the first place.

The case at hand falls into the latter group. Edna Franchini and Valerie Seals sued Accu-Time Systems, Inc., alleging that the company violated BIPA through its fingerprint-scanning hardware and software.

Accu-Time moved to dismiss based on a lack of personal jurisdiction. Accu-Time also argued that the complaint fails to state a claim.

For the reasons explained below, Accu-Time's motion to dismiss is denied.

**Procedural Background**

BIPA emerged from the Illinois General Assembly in 2008. *See Cothron v. White Castle Sys., Inc.*, 20 F.4th 1156, 1159 (7th Cir. 2021). And since then, the Act has taken on a life of its own, submerging courthouses with case after case. The Act controls how private entities handle sensitive biometric data. *Id.*

BIPA wields a heavy hammer. Until recently, a plaintiff could wrack up $5,000 for "*each time* a private entity scans" her biometric identifier in reckless violation of the Act. *See Cothron v. White Castle Sys., Inc.*, 216 N.E.3d 918, 920 (Ill. 2023) (emphasis added); *id.* at 928

(acknowledging the defendant's argument that its holding might result in "astronomical" damages and "annihilative liability"); *Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 620 (7th Cir. 2020) ("BIPA authorizes statutory damages of $5,000 for each intentional or reckless violation."). But a few months ago, the General Assembly amended the statute to place a cap on the amount of statutory damages that a plaintiff can recover, and the Governor signed it into law last week.[1]

The protagonists in the case at hand are Plaintiffs Edna Franchini and Valerie Seals. *See* Cplt. (Dckt. No. 1-1, at 6 of 20). They filed suit against Accu-Time Systems, Inc., an attendance terminal hardware manufacturer and software provider. *Id.* at ¶¶ 1–2, 12.

Accu-Time's terminals "require users to scan their biometric identifiers, namely their fingerprints or hand geometry, as an authorization method to track their time worked." *Id.* at ¶ 3.

Franchini and Seals worked for one of Accu-Time's unnamed Illinois "clients." *Id.* at ¶ 37. The complaint doesn't come out and say where Franchini and Seals worked. But based on the submissions, it appears that they worked for Ecolab. *See* Def.'s Mem., at 2 (Dckt. No. 37).

Accu-Time's on-site equipment "required Plaintiffs to scan their fingerprint into" an Accu-Time "biometric system so that the data could be use[d] . . . as an authentication method to track time." *See* Cplt., at ¶ 38 (Dckt. No. 1-1).

According to Plaintiffs, the scans violated various BIPA provisions. *Id.* at ¶¶ 52–68. So, they sued Accu-Time in state court. They seek to represent a class of all "persons who had their fingerprints or handprints collected, captured, received, otherwise obtained, or disclosed" by Accu-Time "while in Illinois." *Id.* at ¶ 45.

After removing the case to federal court, Accu-Time filed a motion to dismiss and, in the alternative, a motion to stay proceedings until the Seventh Circuit decided a potentially relevant and then-percolating BIPA case. *See* Mtn. to Dismiss, at 1 (Dckt. No. 15) (citing *Cothorn v. White Castle Sys., Inc.*, No. 20-3202 (7th Cir.)).

In the portion of its motion asking this Court to dismiss the case, Accu-Time argued that this Court lacks personal jurisdiction. *See* Def.'s Mem. in Supp. of Mtn. to Dismiss, at 1 (Dckt. No. 16). In response, Plaintiffs asked this Court to green-light jurisdictional discovery. *See* Mtn. for Jurisdictional Discovery, at ¶ 4 (Dckt. No. 19). This Court granted Plaintiffs' motion and set a deadline. *See* 12/3/21 Order (Dckt. No. 20).

---

[1] The new law is hot off the press – so hot, in fact, that this Court hasn't seen the text yet. Commentators are debating whether the statute applies retroactively. This Court does not reach that question. Jurisdiction depends on the state of affairs at the moment that a case arrived in the federal courthouse. *See Oshana v. Coca-Cola Co.*, 472 F.3d 506, 510–11 (7th Cir. 2006) ("[T]he amount in controversy is the amount required to satisfy the plaintiff's demands in full on the day the suit begins, or in the event of removal, on the day the suit was removed.") (cleaned up). And at the time of the filing of the complaint, a plaintiff could recover $5,000 for each violation.

Sometime later, this Court *sua sponte* raised a question about whether the dispute satisfied the amount-in-controversy requirement. *See* 6/7/22 Order (Dckt. No. 32). It also noted that the Seventh Circuit had certified a potentially probative question to the Supreme Court of Illinois that remained pending, and that another relevant case brewed in the Supreme Court of Illinois, too. *Id.* (citing *Cothron v. White Castle Sys., Inc.*, 20 F.4th 1156, 1167 (7th Cir. 2021) and *Tims v. Black Horse Carriers, Inc.*, 184 N.E.3d 1029 (Ill. 2022)).

So, the Court stayed the case and otherwise denied Accu-Time's motion to dismiss without prejudice. *Id.*

Months later, Plaintiffs filed a status report with the latest news: the Supreme Court of Illinois had issued its decisions. *See* Status Report, at 1 (Dckt. No. 34). This Court lifted the stay. *See* 3/1/23 Order (Dckt. No. 35).

Accu-Time filed a renewed motion to dismiss. *See* Renewed Mtn. to Dismiss (Dckt. No. 36).

**Jurisdictional Discovery**

Discovery shed light on whether this Court has personal jurisdiction over Accu-Time.

The Court starts with statements that Accu-Time President and Chief Executive Officer Lisa Gladysz offered at deposition.[2] *See* Gladysz Dep., at 5:16-20 (Dckt. No. 38-1).

Accu-Time has ties to Illinois. The company ships its attendance terminals to Illinois. *Id.* at 12:7-8. It also "coordinates" between its "Illinois-based customer" and a third-party "installer" to "make sure that the Illinois-based installation is done correctly." *Id.* at 64:11-16.

Accu-Time's relationship with its product doesn't end there.

Every single time a customer's employee scans his or her fingerprint to clock in or out of work, the employee's biometric data transfers from the Illinois device to Accu-Time's servers in Virginia. *Id.* at 40:1-4, 41:5-10.

In other words, Accu-Time stores the employee's fingerprint data in its cloud. *Id.* at 42:23-25. When the employee scans his or her fingerprint on the machine, the machine sends the information to Accu-Time's servers. *Id.* at 42:18-22. Accu-Time sees if the incoming data

---

[2] Plaintiffs urge this Court to also consider a deposition from another case that Plaintiff Franchini filed against a different defendant. *See* Pls.' Resp., at 3 (Dckt. No. 38); *see also Franchini v. Ecolab Inc.*, No. 21-cv-891 (N.D. Ill.). This Court declines to do so. Accu-Time was not a party to that lawsuit and did not participate in that deposition. *See* Def.'s Reply, at 7 n.2 (Dckt. No. 40); *see also* Fed. R. Civ. P. 32(a)(8) ("A deposition lawfully taken . . . may be used in a later action involving the same subject matter *between the same parties*, or their representatives or successors in interest[.]") (emphasis added); *Gamble v. Fiat Chrysler Auto.*, 2020 WL 1445611, at *1 n.1 (N.D. Ill. 2020) ("To the extent that Plaintiff's alleged facts do rely on outside depositions, the Court will not consider them for purposes of this Motion.").

3

"matche[s]" a "template" in Accu-Time's cloud. *Id.* at 42:18-25. If a match materializes, the system knows who showed up for work.

In this vein, customers who directly purchased the hardware from Accu-Time pay Accu-Time a "hosting fee" – about $30 dollars per device, per month. *Id.* at 51:18-22.

Accu-Time collects money for other ongoing services. Some customers pay for a "maintenance program" named "express exchange service." *Id.* at 51:22-24. If a customer's device breaks, Accu-Time "will overnight a replacement device to them." *Id.* at 52:2.

Every customer buys a monthly "ConstantCare" service. Customers cough up anywhere from $500 to $2,000 per month for the program. *Id.* at 50:13-14, 52:23 – 53:1. It gives "Illinois-based customers" an "ongoing maintenance relationship." *Id.* at 53:10-15. For example, Accu-Time "updates" the system with "security upgrades." *Id.* at 53:7-9.

Accu-Time also "ping[s] the biometric collection devices" about "every few minutes" to "make sure" it operates "correctly." *Id.* at 58:8-19.

Accu-Time's ability to communicate with its Illinois-based devices also shows up in other instances.

At some point, Accu-Time remotely "modif[ied] its biometric devices in the state of Illinois to cause them to require the 14,000 employees in Illinois who use those devices to enter into an agreement with" Accu-Time. *Id.* at 31:6-19. Accu-Time put some sort of message on the screen, stating that Accu-Time would "comply with" Illinois's "biometric data policy." *Id.* at 33:5 – 36:3. The employees of Accu-Time's clients pressed "agree." *Id.* (This Court does not know whether all of the employees agreed.)

Accu-Time has all of those connections to Illinois. But it doesn't have very many physical connections to the state.

For some time – until 2017 – Accu-Time had one salesperson working in Illinois. *Id.* at 69:5-15. Accu-Time rented office space in Oak Brook for the salesman. *Id.* at 69:5-9, 70:5-11. He "nurtured relationships." *Id.* at 70:17-24.[3] He talked to customers about Accu-Time's "equipment" and "offerings," too. *Id.* at 71:2-4. But Gladysz didn't know if the salesman ever visited Illinois customers in person. *Id.* at 71:5-8.

Sometime before 2018, Accu-Time also attended a "Campus Tech" trade show in Illinois.[4] *Id.* at 73:8-17. The trade show gave Accu-Time an "opportunity to showcase the time clock devices to higher education institutions who might need them." *Id.* at 74:3-7.

---

[3] This Court does not know whether Gladysz's statement means that the salesman "nurtured relationships" with Illinois customers, or with customers nationwide. The deposition questions and answers don't make the subject of the discussion clear.
[4] As the Court understands Gladysz's testimony, she didn't know whether any salesperson interacted with Plaintiffs' employer in Illinois. *See* Gladysz Dep., at 72:13-19 (Dckt. No. 38-1) ("Q: Do you know

4

Gladysz's declaration adds more information into the mix. According to the declaration, Accu-Time does not "own any physical property," "sell its products in any physical location," "conduct any advertising or marketing," "regularly send any company representatives," or maintain bank accounts in Illinois. *See* Gladysz Declaration, at ¶¶ 9–14 (Dckt. No. 37-2). Even more, she says, an Accu-Time employee has not set foot in Illinois "since at least October 2017." *Id.* at ¶ 15.

In other words, the declaration presents a nationwide-focused picture. Accu-Time "develops and markets its time collection hardware, software, and comprehensive cloud-based integration solutions to customers throughout the world." *Id.* at ¶ 4. It does not "specifically target Illinois customers" and does not "maintain" Illinois-specific "sales or marketing programs." *See* Gladysz Reply Declaration, at ¶ 2(c) (Dckt. No. 37-3).

In this vein, Gladysz attested that Accu-Time did not sell a timeclock to Ecolab (Plaintiffs' apparent employer) in Illinois. *Id.* at ¶ 3. Instead, Accu-Time's "contract and agreement with Ecolab was in Minnesota, which is where Ecolab is headquartered, for the provision of goods and services throughout North America." *Id.*

So, Gladysz says that Accu-Time's "contact" with Illinois is the "result" of its *customers'* decisions to use the products in Illinois – not *Accu-Time's* decision. *Id.* at ¶ 2(d).

Even more, Gladysz isn't aware of Accu-Time "securing any customer with an Illinois location as a result of any specific outreach" to a "person located in Illinois." *Id.* at ¶ 5. According to Gladysz, its "Illinois-related biometric customers have one or more locations in Illinois, but are not, in fact, based (*i.e.*, with their principal place of business or headquarters) in Illinois." *Id.* at ¶ 4.

## Analysis

This Court will address personal jurisdiction, and whether the complaint states a claim. But first, the Court must pin down subject matter jurisdiction.

I.      **Subject Matter Jurisdiction**

This Court can only hear a case if it has subject matter jurisdiction. *See Home Depot U. S. A., Inc. v. Jackson*, 587 U.S. 435, 437 (2019). And this Court must batten down every jurisdictional hatch, even if the parties don't raise concerns. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

Accu-Time removed this case to federal court on diversity jurisdiction grounds. *See* Notice of Removal, at 1 (Dckt. No. 1). District courts have diversity jurisdiction over civil actions when the amount in controversy exceeds $75,000 and the suit is between "citizens of different States." *See* 28 U.S.C. § 1332(a)(1).

---

whether anybody from ATS ever traveled to Illinois to meet with anybody at Ecolab? A: No, I don't believe that they did. Q: Do you know what – one way or the other? A: With absolute certainty? No.").

Congress widened the lane for diversity jurisdiction for class actions in the Class Action Fairness Act. *See Tri-State Water Treatment, Inc. v. Bauer*, 845 F.3d 350, 353 (7th Cir. 2017). Under the Act, a district court has the power to hear a class action when: (1) the class has at least 100 members; (2) any member of the class is a citizen of a different state than any defendant ("minimal diversity"); and (3) the aggregate amount in controversy is more than $5 million.[5] *See Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568, 578 (7th Cir. 2017); *see also* 28 U.S.C. § 1332(d)(2)(A), (5)(B).

The first two requirements are met here. First, the proposed class is big enough. Accu-Time thinks that the putative class includes about 350 people. *See* Notice of Removal, at 2–3 (Dckt. No. 1).

Second, there is complete diversity of citizenship. Named Plaintiffs Franchini and Seals are Illinois citizens. *See* Cplt., at ¶ 11 (Dckt. No. 1-1). Defendant Accu-Time (a corporation) is incorporated in Pennsylvania. *See* Gladysz Declaration, at ¶ 3 (Dckt. No. 1-2). Its principal place of business is in Connecticut. *Id.* So, Accu-Time is a Pennsylvania and Connecticut citizen. *See West v. Louisville Gas & Elec. Co.*, 951 F.3d 827, 830 (7th Cir. 2020) (explaining that a corporation is a citizen of its state of incorporation and its principal place of business).

This Court wanted to assure itself that the case satisfied the amount-in-controversy requirement, too. *See* 6/7/22 Order (Dckt. No. 32). The Court stayed the case until the Supreme Court of Illinois wade in and clarified the recoverable damages under the Act. *Id.*

The Supreme Court of Illinois has spoken. First, a five-year statute of limitations governs the Act. *See Tims v. Black Horse Carriers, Inc.*, 216 N.E.3d 845, 854 (Ill. 2023). Second, a plaintiff could recover statutory damages for *each* time a defendant scanned the plaintiff's biometric data in violation of the Act. *See Cothron v. White Castle Sys., Inc.*, 216 N.E.3d 918, 929 (Ill. 2023) ("[A] claim accrues under the Act with every scan or transmission of biometric identifiers or biometric information without prior informed consent."). Again, that holding was the rule until last week, when the Governor signed a new statute into law.

Here, Plaintiffs seek statutory damages for "each" of Accu-Time's BIPA violations. *See* Cplt., at 19 of 20 (Dckt. No. 1-1). Plaintiffs allege that Accu-Time acted recklessly, too. *Id.* at ¶ 25. And Illinois authorizes $5,000 in statutory damages for reckless violations. *See* 740 ILCS 14/20.

---

[5] The notice of removal invoked the general provision about diversity jurisdiction, meaning section 1332(a), not the provision about diversity jurisdiction under the Class Action Fairness Act. *See* Notice of Removal, at ¶ 2 (Dckt. No. 1) ("In particular, this Court has original jurisdiction under 28 U.S.C. § 1332(a)[.]"). Ordinarily, a court cannot aggregate the claims of putative class members, unless the Class Action Fairness Act applies. *See Travelers Prop. Casualty v. Good*, 689 F.3d 714, 717 (7th Cir. 2012) ("The general rule is that the claims of multiple litigants cannot be aggregated to reach the jurisdictional amount in controversy."). Maybe the failure to invoke the Class Action Fairness Act was a waiver. That is, maybe Accu-Time waived the opportunity to take advantage of the more general jurisdictional boundaries of the Act, and is stuck with the narrower opportunity under the traditional statute for diversity jurisdiction. But then again, Plaintiffs didn't flag the issue, either. So, the Court will apply the Class Action Fairness Act, because it seems to apply, even though no one raised it.

It doesn't take a lot of math skills to see that this case could lead to liability of more than $5,000,000. Or, at the very least, that amount of liability was on the table when the case arrived in the federal courthouse.

Plaintiffs allege that the Accu-Time hardware and software scanned Plaintiffs' fingerprints when they "punch[ed]" in and out of work. *See* Cplt., at ¶ 27 (Dckt. No. 1-1). And Accu-Time thinks that the putative class includes about 350 people. *See* Notice of Removal, at 2–3 (Dckt. No. 1).

If each person worked for only two days, and scanned their fingerprint twice each day (to clock in and out of work), the amount in controversy would be about $7 million (*i.e.*, 350 people x 4 scans x $5,000 in statutory damages per scan).[6]

Plaintiffs don't challenge Accu-Time's amount-in-controversy estimate. *See* 6/7/22 Order (Dckt. No. 32). And the Court doesn't see a reason to kick the tires anymore. "[W]hen a defendant seeks federal-court adjudication, the defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff or questioned by the court." *See Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014).

In sum, this Court is satisfied that diversity jurisdiction exists.

## II. Personal Jurisdiction

The next question is whether this Court has personal jurisdiction over Accu-Time. *See* Renewed Mtn. to Dismiss, at 1 (Dckt. No. 36).

Plaintiffs have the burden to establish personal jurisdiction. *See Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) ("[O]nce the defendant moves to dismiss the complaint . . . for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction.").

"The precise nature of the plaintiff's burden depends upon whether an evidentiary hearing has been held." *Id.* "When the district court holds an evidentiary hearing to determine jurisdiction, the plaintiff must establish jurisdiction by a preponderance of the evidence." *Id.*

---

[6] It looks like Plaintiffs would have traditional diversity jurisdiction under section 1332(a), too. *Cf. Peatry v. Bimbo Bakeries USA, Inc.*, 393 F. Supp. 3d 766, 769–70 (N.D. Ill. 2019) ("[T]he Court finds that Bimbo has plausibly alleged the requisite amount in controversy for [the plaintiff] both individually under § 1332(a) and on a class-wide basis under CAFA."). Again, complete diversity exists. For the amount-in-controversy requirement, Plaintiffs wouldn't be able to aggregate the claims across the class. *See Ware v. Best Buy Stores, L.P.*, 6 F.4th 726, 733 (explaining that the "general rule is that the claims of multiple litigants cannot be aggregated to reach the jurisdictional amount in controversy" under section 1332(a)). But Franchini and Sears could each get to $75,000 quickly, with less than two weeks of work (*e.g.,* 2 scans per day x 8 days of work x $5,000 per violation = $80,000).

On the other hand, when a district court "rules on a defendant's motion to dismiss based on the submission of written materials, without the benefit of an evidentiary hearing," a plaintiff needs only to make out a "*prima facie* case of personal jurisdiction." *Id.* (citation omitted).

Here, the parties did conduct discovery. *See* 12/3/21 Order (Dckt. No. 20). But the parties didn't ask this Court to hold an evidentiary hearing. So, the Court didn't hold one.

As a result, Plaintiffs need to make a *prima facie* case of personal jurisdiction. *See Purdue Rsch. Found.*, 338 F.3d at 782 n.12 (favorably citing *Myers v. Bennett L. Offs.*, 238 F.3d 1068, 1071 (9th Cir. 2001) ("When personal jurisdiction is challenged by motion as an initial response, and the district court determines that it will receive . . . affidavits plus discovery materials, these very limitations dictate that a plaintiff must make only a prima facie showing of jurisdictional facts through the submitted materials in order to avoid a defendant's motion to dismiss.") (cleaned up)); *see also* 2 James Wm. Moore, *et al.*, Moore's Federal Practice § 12.31[5] (3d. ed. 2023) ("If the court chooses not to hear evidence, the party need make only a prima facie case that personal jurisdiction exists.").

Under the *prima facie* standard, this Court resolves conflicts in the "affidavits (or supporting materials)" in Plaintiffs' favor. *See Purdue Rsch. Found.*, 338 F.3d at 783; *see also* 2 James Wm. Moore, *et al.*, Moore's Federal Practice § 12.31[5] (3d ed. 2023) ("The court has discretion to allow discovery. However, even if the court receives discovery materials, it should not act as fact-finder and should construe all disputed facts in the plaintiff's favor. This approach relies on a prima facie showing and postpones the necessary factual determinations until trial.").

With that standard in mind, the Court turns to the governing principles.

This Court must have personal jurisdiction over a defendant to hale it into a courthouse. In other words, this Court must have "power to bring a person into its adjudicative process." *See N. Grain Marketing, LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014) (citation omitted).

In diversity jurisdiction cases, a federal district court's jurisdiction over a defendant is established "when the plaintiff serves the defendant with a summons or files a waiver of service," as long as the "defendant is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located – here, Illinois." *Id.*

This Court can only exercise jurisdiction over Accu-Time if "authorized both by Illinois law and by the United States Constitution." *See Engs Com. Fin. Co. v. Premiere Copier, Inc.*, 2023 WL 3259780, at *4 (N.D. Ill. 2023) (quoting *be2 LLC v. Ivanov*, 642 F.3d 555, 558 (7th Cir. 2011)).

The "Illinois long-arm statute permits the exercise of jurisdiction to the full extent permitted by the Fourteenth Amendment's Due Process Clause." *See Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). Put differently, the "two-part analysis collapses into one – if personal jurisdiction passes constitutional muster, it complies with Illinois law, too." *See Engs*, 2023 WL 3259780, at *4.

So, the Court turns its attention to the Due Process Clause. Personal jurisdiction comes in two flavors: general and specific. *See Daimler AG v. Bauman*, 571 U.S. 117, 126–28 (2014).

General jurisdiction exists when a defendant has continuous and systematic connections to the forum state. *Id.* at 127. In other words, general jurisdiction exists when a defendant is "at home" in the state. *See Goodyear Dunlop Tire Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

Specific jurisdiction demands that a defendant "purposefully directs its activities at the forum state" and that "the alleged injury arises out of those activities." *See Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 444 (7th Cir. 2010).

So, a defendant can't only have "random, fortuitous, or attenuated" contacts with the forum state spurred by "interacting with other persons affiliated with the State." *See Walden v. Fiore*, 571 U.S. 277, 286 (2014).

Instead, the defendant's relationship with the State must "arise out of contacts that the 'defendant *himself*' creates with the forum State." *See In re Sheehan*, 48 F.4th 513, 522 (7th Cir. 2022) (emphasis in original); *see also* 16 James Wm. Moore, *et al.*, Moore's Federal Practice § 108.42[3] (3d ed. 2023) ("[A] third party cannot form the only link between the defendant and the forum; instead, the defendant's conduct must form the necessary connection with the forum state.").

Finally, a court can't exercise specific jurisdiction over a defendant if the exercise would obliterate "traditional notions of fair play and substantial justice." *See Tamburo*, 601 F.3d at 709.

The Seventh Circuit has boiled down those principals into three "essential requirements." *See Lexington Ins. Co. v. Hotai Ins. Co., Ltd.*, 938 F.3d 874, 878 (7th Cir. 2019) (citation omitted).

First, "the defendant's contacts with the forum state must show that it purposely availed itself of the privilege of conducting business in the forum state or purposefully directed its activities at the state." *Id.* (cleaned up). "Second, the plaintiff's alleged injury must have arisen out of the defendant's forum-related activities." *Id.* Finally, personal jurisdiction must not offend "traditional notions of fair play and substantial justice." *Id.*

Plaintiffs don't argue that this Court has general jurisdiction over Accu-Time. *See* Pls.' Resp., at 7 (Dckt. No. 38). So, the Court will focus on specific jurisdiction, and will turn to the three requirements.

9

### A. Purposeful Availment

The first question is whether Accu-Time "purposely availed itself of the privilege of conducting business in the forum state or purposely directed its activities at the state." *See Lexington Ins. Co.*, 938 F.3d at 878 (cleaned up).

The "purposeful availment inquiry is ultimately about whether the party should reasonably anticipate being haled into court in the forum state." *See Trade Well Int'l v. United Cent. Bank*, 825 F.3d 854, 859 (7th Cir. 2016). If a defendant's "own choice" creates contacts with the forum state, the defendant shouldn't be surprised if it ends up in the state's courthouse. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021).

Purposeful availment "is like casting a line into a pond, hoping to hook something. After reeling in a big catch, the person holding the fishing pole cannot say that he was not purposefully availing himself of the pond." *See Engs*, 2023 WL 3259780, at *6.

This is *not* a case where Accu-Time simply provided "technology to its corporate customers outside of Illinois, with limited or no knowledge on how the technology eventually winds up in Illinois or is used by Illinois residents." *See Crumpton v. Haemonetics Corp.*, 595 F. Supp. 3d 687, 696–97 (N.D. Ill. 2022) (collecting cases concluding that personal jurisdiction did not exist); *see also Bray v. Lathem Time Co.*, 2020 WL 1492742, at *3 (C.D. Ill. 2020) (no personal jurisdiction where the defendant shipped a product to Arkansas and its customer moved the product into Illinois); *Salkauskaite v. Sephora USA, Inc.*, 2020 WL 2796122, at *5 (N.D. Ill. 2020) (similar).

This is a case where Accu-Time *knew* that its products landed in the Illinois pond, and continued to extract fish from the pond in the form of dollars and data.

Indeed, Accu-Time "deliberately entered into contractual and business arrangements to ensure that its software collected data in Illinois," and Accu-Time itself "hosted Illinois resident[s'] data on its servers." *See Crumpton*, 595 F. Supp. 3d at 697 (concluding that personal jurisdiction existed).

Remember, every single time an employee punched in and punched out, the employee's biometric data transferred from the device in Illinois to Accu-Time's cloud-based storage in Virginia. *See* Gladysz Dep., at 40:1-4, 41:5-10 (Dckt. No. 38-1). Accu-Time seemingly earns a monthly fee for "hosting" that data, too. *Id.* at 51:18-22.

So, Accu-Time "knowingly stored Illinois residents' data, obtained at those Illinois locations, for financial gain and allegedly in violation of BIPA's disclosure requirements." *See Crumpton*, 595 F. Supp. 3d at 698 (finding that personal jurisdiction existed where the defendant earned "hosting 'fees'"); *see also Greene v. Mizuho Bank, Ltd.*, 169 F. Supp. 3d 855, 862–63 (N.D. Ill. 2016) (personal jurisdiction existed over a bank that "created the necessary relationship with California by accepting [a] deposit, knowing that it arrived from a California branch and a California resident, and profiting from the associated fees"); *King v. PeopleNet Corp.*, 2021 WL 5006692, at *6 (N.D. Ill. 2021) ("While [defendant] may have also served a nationwide market,

defendant's business here centered on scanning Illinois employees' biometric information and handling the resulting data.").

Accu-Time receives money from Illinois, and data from Illinois. So, Accu-Time doesn't have much of a basis to complain that a lawsuit wants Accu-Time to send money in the other direction.

True, a "non-party employer" might have "played a role in creating some contacts" between Accu-Time's technology and Illinois. *See King*, 2021 WL 5006692, at *7. Illinois employers might have "made decisions" that "led to contacts" between Accu-Time's "devices and this state." *Id.* But "those decisions weren't unilateral." Accu-Time "itself set the system up this way." *Id.* (quoting *uBid, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 428 (7th Cir. 2010)).

Even more, at some point Accu-Time manipulated its devices so that thousands of Illinois-based employees acknowledged a statement that Accu-Time would comply with the Act. *See* Gladysz Dep., at 33:5 – 36:22 (Dckt. No. 38-1).

In other words, Accu-Time appears to have "modified" the product "specifically for Illinois" end-users. *See Kashkeesh v. Microsoft Corp.*, 2022 WL 17687802, at *1 (N.D. Ill. 2022) (concluding that personal jurisdiction over the defendant existed); *cf. Salkauskaite*, 2020 WL 2796122, at *4 declining to find personal jurisdiction where the defendant had not "modifi[ed]" the technology for "state-specific objectives or needs").

In sum, Accu-Time might not have purposely dropped off its devices in Illinois to start. But the company can't claim surprise today that it receives data from thousands of Illinois residents' biometric information.

### B. Arising out of the Contacts

The next question is whether Plaintiffs have shown that their alleged injury arose out of Accu-Time's forum-related activities. *See Lexington Ins. Co.*, 938 F.3d at 878.

A court has personal jurisdiction over a defendant when the plaintiff's underlying injuries "arise out of or relate to the defendant's contacts" with the forum state. *See Ford Motor Co.*, 141 S. Ct. at 1026 (citation omitted) (emphasis omitted). The "arise out of" clause contemplates a causal relationship, and the "relate to" clause imagines "that some relationships will support jurisdiction without a causal showing." *Id.*

"[D]ue process requires only that the relationship among the defendant, the forums, and the litigation . . . is close enough to support specific jurisdiction." *See NBA Props., Inc. v. HANWJH*, 46 F.4th 614, 626 n.18 (7th. Cir. 2022) (cleaned up). The defendant's contact with the state and the litigation must be "related." *Id.*

This lawsuit is related to Accu-Time's contacts with Illinois.

11

The suit alleges that Accu-Time violated BIPA when it collected Illinois residents' biometric data – and Accu-Time collected the data because customers pay it to do so. *See Trio v. Turing Video Inc.*, 2022 WL 4466050, at *6 (N.D. Ill. 2022) ("[Defendant's] contacts with Illinois involve sales of the very same [product] that led to Plaintiff's alleged injury.") (denying a motion to dismiss for lack of personal jurisdiction); *see also King*, 2021 WL 5006692, at *7 ("[Defendant's] conduct in the Illinois biometric information market led to it capturing [Plaintiff's] biometric data in Chicago. That [Defendant] relied on third parties . . . to deploy its technology does not sever the relationship between [Plaintiff's] claims and [Defendant's] contacts with the forum.") (concluding that the claims related to the defendant's contacts with Illinois and that personal jurisdiction existed).

In sum, the arising-under prong is satisfied. Accu-Time's contact with Illinois "relates" to this lawsuit – and it's a close relationship, too. The suit isn't a long-lost cousin that appeared for the first time at a family reunion.

### C. Fair Play and Substantial Justice

Finally, this Court's exercise of personal jurisdiction over Accu-Time must respect "traditional notions of fair play and substantial justice." *See Lexington Ins. Co.*, 938 F.3d at 878.

Relevant factors include "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985) (cleaned up).

When a plaintiff makes "a threshold showing of minimum contacts" with the forum state, a defendant can't defeat the showing unless it offers a "compelling case" that jurisdiction would be "unreasonable." *See Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 402 (7th Cir. 2020) (citations omitted).

Here, Accu-Time doesn't make any argument of the sort. *See* Def.'s Renewed Mtn. to Dismiss, at 6–10 (Dckt. No. 37). So, Accu-Time doesn't land a punch on Plaintiffs' threshold showing.

In sum, Plaintiffs carried their burden to make a *prima facie* case of personal jurisdiction. Accu-Time's motion to dismiss for lack of personal jurisdiction is denied.

## III. The Merits

Accu-Time also moved to dismiss the complaint for failure to state a claim. *See* Def.'s Renewed Mtn. to Dismiss, at 10–13 (Dckt. No. 37).

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all

well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678.

The complaint alleges that Accu-Time violated sections 15(a), (b), (c), and (d) of BIPA. *See* Cplt., at ¶¶ 59–64 (Dckt. No. 1-1). Accu-Time makes two arguments for dismissal.

A.  Sections 15(a), (c), and (d)

First, Accu-Time argues that the complaint does not state claims under sections 15(a), (c), and (d) because the complaint does not allege that Accu-Time had "possession" of Plaintiffs' biometric data. *See* Renewed Mtn. to Dismiss, at 10 (Dckt. No. 37).

Those sections of the Act do restrict their reach to private entities "in possession" of biometric data. *See* 740 ILCS 14/15(a), (c), (d).

The Act does not define "possession." *See Heard v. Becton, Dickinson & Co.*, 440 F. Supp. 3d 960, 968 (N.D. Ill. 2020) (citing 740 ILCS 14/10). This Court assumes that the term has its "popularly understood meaning" or its "settled legal meaning," if one exists. *See Rosenbach v. Six Flags Ent. Corp.*, 129 N.E.3d 1197, 1205 (Ill. 2019).

The Supreme Court of Illinois has held that "'possession,' as ordinarily understood, occurs when a person has or takes control of the subject property or holds the property at his or her disposal." *See People v. Ward*, 830 N.E.2d 556, 560 (Ill. 2005).

The Court takes that definition. *See Heard*, 440 F. Supp. 3d at 968 ("[N]othing in . . . BIPA indicates that the ordinary definition of possession does not apply"); *see also Patterson v. Respondus, Inc.*, 593 F. Supp. 3d 783, 822–23 (N.D. Ill. 2022). If you have it, you possess it.

According to Accu-Time, the complaint does not allege that Accu-Time "possessed" Plaintiffs' data because the word "possession" only appears in the complaint's generic statement that BIPA "mandates that companies in possession of biometric data establish and maintain a satisfactory biometric data retention . . . policy." *See* Renewed Mtn. to Dismiss, at 10 (Dckt. No. 37) (citing Cplt., at ¶ 54 (Dckt. No. 1-1)).

Accu-Time's argument falls short. The complaint *does* allege that Accu-Time "has or takes control of the subject property." *See Ward*, 830 N.E.2d at 560.

For example, the complaint alleges that when a person scans her fingerprint on Accu-Time's device, her biometric data "is transmitted to" Accu-Time's "database." *See* Cplt., at ¶ 5 (Dckt. No. 1-1). The information "is broadcast through" Accu-Time's "software and web-based

13

data collection and storage system." *Id.* at ¶ 6.  Even more, the complaint alleges that Accu-Time disclosed the fingerprint data to "at least one out-of-state third-party vendor." *Id.* at ¶ 28.

These allegations put Accu-Time's "possession" of the data into play.  If Accu-Time has data in its database, it possesses the data.  *See Patterson*, 593 F. Supp. 3d at 822–23 (rejecting a defendant's similar argument because the plaintiff "adequately sketched out" how the defendant "obtains or generates biometric data").

Accu-Time is overly parsing the complaint, demanding too much at the motion-to-dismiss stage.  If Accu-Time doesn't possess the data, Accu-Time is free to file a motion for summary judgment.  In the meantime, the complaint survives.

### B.     Section 15(b)

Next, Accu-Time challenges the claim under section 15(b).  *See* Renewed Mtn. to Dismiss, at 11 (Dckt. No. 37).  Specifically, Accu-Time argues that Plaintiffs fail to allege that Accu-Time "collected" Plaintiffs' biometric data.  *Id.*

Unlike other sections of the Act, section 15(b) "doesn't penalize mere possession of biometric information." *See King*, 2021 WL 5006692, at *8; *compare* 740 ILCS 14/15(b) ("No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first . . . .") *with* 740 ILCS 14/15(c) ("No private entity in *possession* of a biometric identifier . . . may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information.") (emphasis added).

In this vein, Accu-Time argues that courts "consistently dismiss" section 15(b) claims "when the complaint fails to allege that the defendant took an active step in collecting the plaintiff's biometric data." *See* Renewed Mtn. to Dismiss, at 11 (Dckt. No. 37).

Maybe so.  But the complaint alleges affirmative acts.  The complaint alleges that the fingerprint data "is broadcast through" Accu-Time's "web-based data collection and storage system." *See* Cplt., at ¶ 6 (Dckt. No. 1-1).

This allegation supports the reasonable inference that Accu-Time took an active step to program its software to trigger the broadcast, and that the broadcast didn't just occur by happenstance.  *See King*, 2021 WL 5006692, at *8 ("[I]f the statue requires a showing that [the defendant] took an 'active step' towards collection of biometric information, plaintiff's complaint survives that test because the complaint spells out how [the defendant] obtained [the plaintiff's] information.").

Seeing things differently, Accu-Time points to a smattering of cases.  *See* Renewed Mtn. to Dismiss, at 11 (Dckt. No. 37).  For example, a court dismissed a complaint's section 15(b) allegation as implausible in *Namuwonge v. Kronos, Inc.*, 418 F. Supp. 3d 279, 285–286 (N.D. Ill. 2019).  There, the complaint simply alleged that the plaintiff's third-party employer "collected

14

the fingerprints using a system that" the defendant supplied.  *See Namuwonge*, 418 F. Supp. 3d at 286.

"Without more," the plaintiff did not plausibly allege that the defendant *itself* "collected, captured, or otherwise obtained" the plaintiff's biometric information.  *Id.*; *see also Heard*, 440 F. Supp. 3d at 967 (dismissing a complaint because it did not plead information about the defendant's involvement beyond that the defendant "supplied" the technology) (citation omitted).

Here, the complaint offers more.  Again, the complaint "spells out" how Accu-Time "obtained" Plaintiffs' biometric data.  *See King*, 2021 WL 5006692, at *8; *see also* Cplt., at ¶¶ 5–6 (Dckt. No. 1-1) ("When individuals scan their fingerprint" in an Accu-Time "biometric time tracking system as a means of authentication, their biometric information and biometric data is transmitted to" Accu-Time's "database.  Thereafter, the data is broadcast through" Accu-Time's "software and web-based data collection and storage system.").

That's enough to survive dismissal at this early stage.

## Conclusion

For those reasons, the motion to dismiss is denied.

Date:  August 5, 2024

Steven C. Seeger
United States District Judge

15